922 N.E.2d 671 (2010)
W.S.K., Appellant-Plaintiff,
v.
M.H.S.B., Appellee-Defendant.
No. 71A03-0903-CV-106.
Court of Appeals of Indiana.
March 10, 2010.
*674 Patrick F. Mastrian III, Brown, Tompkins, Lory & Mastrian, Indianapolis, IN, Attorney for Appellant.
N. Kent Smith, Christopher C. Eades, Kimberly A. Emil, Hall, Render, Killian, Heath & Lyman, Indianapolis, IN, Attorney for Appellee.

OPINION
FRIEDLANDER, Judge.
W.S.K. appeals a grant of summary judgment in favor of M.H.S.B. in a multi-count complaint against M.H.S.B. stemming from that facility's denial of his application to join its medical staff.[1] In his complaint, W.S.K. sought recovery under *675 seven separate theories and did not prevail on any of them, as the trial court entered summary judgment against him on all counts. Upon appeal, W.S.K. challenges the trial court's ruling with respect to only three of those theories, including discrimination, defamation, and breach of contract. W.S.K. presents the following restated issues for review[2]:
1. Did the trial court err in entering summary judgment against W.S.K. on his claim for race discrimination?
2. Did the trial court err in concluding that federal and state statutes confer immunity upon M.H.S.B. from W.S.K.'s claims and did M.H.S.B. accord W.S.K. due process in reviewing his application?
3. Did the trial court err in entering summary judgment against W.S.K. with respect to his claim of defamation?
4. Did the trial court err in entering summary judgment against W.S.K. with respect to his breach-of-contract claim?
5. Did the trial court err in granting in part and denying in part M.H.S.B.'s motion to strike certain materials designated by W.S.K. in opposition to summary judgment, including a deposition statement made by Dr. Rafat Ansari, deposition statements and an affidavit submitted by Dr. Maureen Ziboh, and in granting W.S.K.'s motion to strike an affidavit submitted by Carolyn Nemes?
We affirm.
The facts and procedural history in this case are lengthy. We will set them out in detail, as they are critical to the issues presented. W.S.K. is an oncologist/hematologist. In July 1999, he commenced employment with Elkhart Memorial Clinic (Elkhart Clinic) and in August 1999, he obtained hospital privileges at Elkhart General Hospital (EGH). W.S.K. became a member of Elkhart Clinic "two or three years" later. Appellant's Appendix at 1048. EGH's Medical Staff Quality Improvement Committee (the Quality Committee) documented the following complaints or incidents involving W.S.K. in 2000:

April 19Failure to assess critical pt admitted from ED at 0830 with Hgb of 5.4. Did not arrive until 1500.

July 12Late to established family meetings or didn't show up at all.

July 25Failure to respond to pages in a pt with neutropenic fever[.]

*676 August 2Ordered bone marrow biopsy for 1600, lab present and waiting. Arrived at 1730-pt transfer to nursing home delayed due to time of day, an additional 1 day LOS.

August 3Left Oncology unit without ordered [sic] pain meds for a pt and the [sic] did not return pages from the nurse; left floor without ordering x-rays for a pt for whom [sic] he told he would order it.

September 5Dr. Pletcher wrote an order that Dr. W.S.K. was to follow his patients until 9/5. There were no orders on the chart for those three days and no visits documented in the progress notes since Sept. 2nd.

September 6D. W.S.K. was primary physician on caselast documented visit was 9/3.

September 7generalized [sic] complaints about a delayed discharge and family/pt perceptions.

September 8Hospice Coordinator and Manager both upset with behavior of physician toward staff and treatment of patient.

September 18From Lab to Nursing Directorhaving problems with meeting the needs of Dr. W.S.K. in the assisting of bone marrows. Schedules with the lab and then doesn't arrive until hour(s) later, or reschedules them and the same thing happens.

September 21Confrontation on the Oncology unit between Dr. Pletcher and Dr. W.S.K. regarding confusion on who was covering patients on the unit. Dr. Pletcher stated the on-call physician covers the ED patients, but they are each supposed to cover their inpatients.

September 21It is "noticed" that other physicians are increasingly frustrated with Dr. W.S.K.

September 25Issues with bone marrow biopsies againorders delayed by several hours due to non-response to pages (1830 to 2300).

October 2Oncology Nurse approached Nursing Director very upset with concerns that she had several bad experiences with physician not listening to her.
Id. at 419-20.
The same report noted that on December 1, 2000, a letter was sent to W.S.K. inviting him to attend the next Quality Committee meeting to discuss the issues of timely responses to pages, meetings with patients and families, and attitude toward the staff. Another complaint against W.S.K. was documented on December 13, 2000, this one stating, "case management staff frustrated with families being upset about interactions with Dr. W.S.K." Id. at 420. The following notation appeared, dated December 19, 2000: "Appeared at MSQIC meeting. Encouraged to increase teamwork, emphasize a team approach on the unit, and improve communication. Physician agreed that he would try to respond more timely, and consider having a Physician Extender help him." Id.
In 2001, the Quality Committee documented at least six additional complaints lodged against W.S.K. concerning the issues of failing to respond to pages and a lack of diligence in keeping scheduled appointments or fulfilling obligations in a timely manner. There were three documented entries in 2002 involving W.S.K.'s failure to respond to pages. In 2003, the Quality Committee documented the following entries:

February 3Using abbreviations not approved. Referred to Medical Record Committee.

February 11MSQIC form[[3]] completedW.S.K. paged numerous times without response.

*677 March 24Incident report and MSQIC form completed by ED. Patient needed to be admitted, but W.S.K. had not called in orders yet. Patient eventually signed out AMA.

June 4W.S.K. gave a telephone order for intrathecal chemotherapy. Oncology Policy states verbal orders are not acceptable for cytotoxic agents.

June 27MSQIC form completed rudeness to staff nurse in front of patientsdemeaning and belittling her, then refusing to acknowledge her presence in room.

August 16MSQIC form completed by Outpatient Surgery. W.S.K. scheduled 0730 case with Dr. Kibiloski for iliac access for bone marrow. Tried to page W.S.K. 7 times ("911) [sic] from 0720 to 742. Finally returned call at 0752. Case cancelled. Patient very upset. Dr. Kibiloski very upset. Physician stated he "forgot".

September 9Incident report completed by Surgical Services for unresponsiveness to pages from Dr. M. Thomas. Paged several times until returned call 30 minutes later. Surgical case delayed, then cancelled.
Id. at 417 (footnote supplied).
On July 1, 2003, Terri Hilyard, the vice president of nursing, met with W.S.K. to discuss "growing concerns with the relationship between the nursing staff on the oncology unit and him and specifically regarding his interactions involving one nurse." Id. On July 10, 2003, Hilyard met with W.S.K. again after attending a July 3 meeting at which "the staff, without exception, all felt vehemently that they were very frustrated with him" especially with respect to his treatment of the nurse mentioned by Hilyard at the July 1 meeting. Id. W.S.K. indicated to Hilyard that he was willing to work on a plan to improve his communication and interaction with the nurses. According to the report, however, "after multiple calls by [name blanked out] to set this up, he either was not available, or didn't prefer to have the subsequent meetings." Id. at 418.
Moving forward to 2004, the Quality Committee documented three more incidents where an MSQIC form was completed because W.S.K. failed to respond to pages, one of which involved a 911 page. On March 24, an MSQIC form was completed upon the following grounds: "[P]atient's daughter noticed a `No Code' sticker at bedside and stated they had not agreed to that. [S]he wanted to be a full code. Nurse notified Dr. W.S.K. who stated to tell the patient she would be a `no code' tonight and can talk to him in the morning." Id. at 416. On June 5 and 6, the Quality Committee documented the following:
Alleged falsification of records. Physician did not round on patients all day on Saturday, 6/5 (did do "telephone" rounds with nurses), nor on Sunday, 6/6 until approximately 7:40 pm. Dr. Mellin had spoken with Dr. W.S.K. on Saturday morning and clarified that [W.S.K.] would see his patients on Saturday. Subsequently, Dr. Mellin personally checked the charts the next morning (Sunday) for physician orders or progress notesneither of which were [sic] found. On Monday morning, 6/7, upon inspection of the charts, progress notes were found to be dated for 6/5, including physician assessment findings. There *678 was no indication of a late entry or phone assessment.
Id.
On April 20, 2004, the Quality Committee sent a written notification to W.S.K. asking him to review the two most recently filed MSQIC forms, i.e., the failure to respond to a 911 page and the "no code" incident mentioned above, and to file a written response thereto. Quality Committee records indicate that the chairman of the committee spoke with W.S.K. on May 18 and reminded him of the need to file a written response to the April 20 request. W.S.K. still had not filed a written response as of May 25, by which time another MSQIC form had been filed reporting that W.S.K. had failed to respond to a 911 page. Thus, on May 25, 2004, the Quality Committee sent a letter to W.S.K. asking him to appear at a June 15 Quality Committee meeting "due to no response." Id.
Minutes of the June 15 meeting reflect that W.S.K. had filed a written response on June 14 and appeared at the meeting. With respect to the availability issue, W.S.K. "stated that he is always available to the Nursing staff, and that he has spoken to nurses on every shift and given them his home phone, cell phone, direct office phone, and pager." Id. at 446. He also claimed that another named physician "always covers for him when he is not available." Id. On the matter of the alleged falsification of records, W.S.K. claimed he was out of town until midnight on the Saturday in question, and that he came in at that time and visited several patients, although none of the nurses on duty at the time saw him there that night. He also claimed that he did the documentation the following day. After the meeting, the Quality Committee voted to continue to monitor W.S.K.'s responsiveness. The minutes of the meeting include the following conclusions:
1. Further investigate [W.S.K.'s] presence on the night in question ... by checking with Nursing to see if anyone did see him.
2. Send [W.S.K.] a summary of this discussion and suggest appropriate time periods for responding, such as five minutes for a 911 call, and thirty minutes for a general call.
3. Continue to monitor [W.S.K.'s] responsiveness.
4. One more incident of this type will result in more serious action.
Id.
A subsequent investigation revealed that although W.S.K. was present in the hospital on June 5 and performed telephone "rounds" of his patients, there was no evidence, apart from his own assertion, that W.S.K. did, in fact, personally round his patients on June 5. After conferring with legal counsel, the Quality Committee issued a peer review report including the following findings and recommendations:
1) Nursing /Staff Relations: Dr. W.S.K.'s behavior has included personal or professionally demeaning behavior toward nursing and other staff, behavior that is being inferred as intimidating, and this has been monitored and followed-up over at least a 3 year period. Attempts at intervention have been unsuccessful.
2) On-Call Availability: Multiple incidences of lack of availability while on call to the Oncology nursing unit have been documented. These at times have included non-availability for hours, even with "911" pages, and patients have at times required intervention by other physicians, due to Dr. W.S.K.'s lack of availability. Attempts to discuss with Dr. W.S.K. *679 and come up with corrective action have proven unsuccessful.
3) Compliance with Medical Record/Medical Staff Policy: Following extensive review (details will be provided upon request), it is the unanimous opinion of the MSQIC that Dr. W.S.K. both did not round on patients on June 5, 2004, and falsely dated entries in the medical record written on 6/5/04 and 6/6/04, or thereafter.
Recommendations: Following discussion with the MSQIC, and in consultation with hospital attorney James Hogan, the following recommendations are respectfully made regarding these issues, and a plan of behavioral improvement:
1) Administrative suspension from Medical Staff for fourteen days.
2) Formal letter of reprimand.
3) Probationary perid [sic] of at least six months with MSQIC review, and concurrent behavior and records monitoring.
Id. at 449. The report also included specific performance improvement guidelines in the three identified problem areas. Dr. Douglas Jarvis, chairman of the Quality Committee, spoke with W.S.K. about the matter by phone on July 6. The next day, July 7, the Quality Committee mailed a copy of the peer review report to W.S.K. via certified mail. The certified mailing receipt was signed on July 12, 2004.
On July 16, 2004, W.S.K. submitted an application to M.H.S.B. for medical staff membership and clinical privileges. The application packet included several forms W.S.K. had completed. On one of those forms, he checked "no" in the appropriate box beside the following statements:
Have your employment, medical staff membership or clinical privileges at any hospital, managed care organization, military service, or any other health care organization ever been voluntarily or involuntarily suspended, reduced, refused, revoked, relinquished, placed on probation, or not renewed, for reasons other than completion of medical records?
Have you ever been the subject of disciplinary proceedings or investigations at any hospital or healthcare facility, or are any investigations pending?
Have you ever been the subject of focused individual monitoring at any hospital or healthcare facility, or are any investigations pending?
Do you have any unresolved Professional Review Organizations or hospital quality issues or sanctions in the past or currently pending?
Id. at 244, 247. On September 9, 2004, Dr. Michael Englert, Chief of M.H.S.B.'s Department of Medicine, reviewed the application W.S.K. had submitted and recommended that it be approved. On September 21, 2004, the M.H.S.B. Credentials Committee (the MCC) met concerning W.S.K.'s application and asked W.S.K. to present to the MCC because they wanted to discuss his ability to provide appropriate back-up call coverage and to inquire into his reasons for leaving his practice at Elkhart Memorial to start a new one in South Bend. The MCC met with W.S.K. on October 19 and asked him to execute an authorization permitting the MCC to obtain his peer review records from EGH and he agreed. EGH subsequently sent the requested documents to the MCC and also sent a copy to W.S.K.
The MCC received the peer review materials from EGH and met on November 16, 2004. The minutes from that meeting stated:
Dr. Kelly advised that he and Dr. Wibbens met with Dr. W.S.K. yesterday to discuss his administrative suspension at [EGH] and his failure to find specialty *680 coverage, as well as to give him an opportunity to withdraw his application. Dr. W.S.K. was asked to try to obtain coverage again, however, he was also advised that his administrative suspension is an issue.... Dr. Friend advised that he reviewed the information received from [EGH] concerning the administrative suspension and is concerned that there was a long standing, repetitive problem with not responding to calls, behavior issues, and falsification of medical records. The question was raised as to whether we can deny his application based upon the fact that he had a relationship with the Elkhart Memorial Clinic and they haven't provided us with any substantial information or that we have the information from [EGH] and don't have to accept his application. Dr. Kelly advised that Dr. W.S.K. should probably meet with this Committee again so that specific questions can be addressed to him concerning the administrative suspension. He encouraged everyone to review the file before the next meeting. Additionally, Dr. Kelly will call Dr. W.S.K. and advise him that even if he does find specialty coverage, the Committee may not recommend him for medical staff membership and privileges.
Id. at 470. The MCC met again on December 14 concerning W.S.K.'s application. Dr. Kelly informed the group that W.S.K. "has not yet found an eligible alternate physician with equivalent privileges at M.H.S.B. who agrees to be available for him in his absence." Id. at 476. Noting that such coverage was "a stipulation in the Medical Staff Rules and Regulations[[4]], it was felt that this application could not be processed any further." Id. The MCC determined that it could not process W.S.K.'s application any further, and sent a letter to W.S.K. notifying him of that decision. The letter also provided, "if [W.S.K.'s] situation changes, he is welcome to re-apply." Id.
On February 3, 2005, W.S.K. submitted his second application to M.H.S.B. As was the case with the first application, W.S.K. checked "no" next to the questions asking whether he had been disciplined for his inability to work with others or whether he had "any unresolved Professional Review Organizations or hospital quality issues or sanctions in the past or currently pending". Id. at 266. This application was reviewed by Dr. Englert, who then completed a form entitled, M.H.S.B. "Summary of Qualifications and Recommendation for Privileges and Medical Staff Appointment." Id. at 458. On the recommendation line, Dr. Englert entered, "NOT RECOMMENDED BY DEPARTMENT CHIEF". Id. After receiving Dr. Englert's recommendation, the MCC invited W.S.K. to meet with the group and discuss the issues raised in the documents provided by EGH. At the April 19, 2005 meeting, the MCC asked W.S.K. about each of the concerns raised in the EGH report. W.S.K.'s answers and explanations did not alleviate the MCC's concerns. *681 Minutes from the meeting recorded the outcome:
Following a discussion, a motion was made to not recommend Dr. W.S.K.'s request for medical staff membership and clinical privileges to the Medical Executive Committee based on his failure to disclose the suspension on both applications and the seriousness of the nature of the suspension at [EGH]. However, it was suggested that Dr. W.S.K. be given the opportunity to withdraw his application[[5]] before forwarding the adverse recommendation to the Medical Executive Committee. The motion was seconded and unanimously approved.
Id. at 482.
Drs. Wibbens and Kelly met with W.S.K. on April 21, 2005 to discuss with him the implications of the MCC's recommendation. Dr. Wibbens offered W.S.K. the opportunity to withdraw his application, explaining that if he chose to proceed with his application, the MCC's adverse recommendation would be forwarded to the Medical Executive Committee (the MEC). On April 29, Dr. Keith Sherry, president of the medical staff and chairman of the MEC, met with W.S.K. at W.S.K.'s request. At that time, Dr. Sherry was aware that W.S.K.'s application for appointment to the medical staff would arrive shortly with a recommendation of denial from the MCC, but he had not reviewed any of the materials related to W.S.K.'s application. He met with W.S.K. to "get a feel for the situation." Id. at 551. Dr. Sherry explained the review process to W.S.K. and assured him that "he would be treated in a completely fair manner and have all the rights associated with the application." Id. Dr. Sherry also assured W.S.K. he "would do everything personally to make sure [W.S.K.] had all the rights that he could possibly have if the MEC did deny him appointment to the medical staff." Id. Following his meeting with W.S.K., Dr. Sherry e-mailed Pam Hall, M.H.S.B.'s Medical Staff Coordinator. He summarized his conversation with W.S.K. and speculated as to whether W.S.K. was entitled to a Fair Hearing[6] under M.H.S.B.'s by-laws if his application was denied on the basis of falsification of records.
On May 2, 2005, the MEC formally met to discuss W.S.K.'s application. Although Dr. Sherry had by then reviewed the material provided by EGH, the other members of the committee had not. Therefore, after Dr. Kelly appeared as chair of the MCC and formally recommended that the MEC deny W.S.K.'s application, the MEC determined to table further consideration of W.S.K.'s application until the next meeting, by which time the other members would have reviewed the EGH materials. W.S.K. asked to attend the meeting at which his application would be reviewed, but Dr. Sherry indicated he did not think such would be appropriate. Dr. Sherry suggested, however, that W.S.K. submit a letter for consideration.
*682 On May 26, 2005, W.S.K. submitted a letter to the MEC detailing his responses to the deficiencies that were the subject of the EGH peer review disciplinary matters. The MEC met again on June 6 to consider W.S.K.'s application. Dr. Kelly appeared again, provided an overview of the MCC's actions, and left the meeting. The members read W.S.K.'s May 26 letter and began deliberating his application. The results of the meeting were detailed in the minutes of that meeting as follows:
Dr. Sherry advised that if the [MEC]'s recommendation were adverse, Dr. W.S.K. would be entitled to the procedural rights provided in the Fair Hearing Plan. He further advised that the final decision would come from the Board of Trustees, and if adverse, it would be reportable to the National Practitioner Databank.
Dr. Englert, Chief of the Department for Medicine, indicated that, after reading the information regarding the suspension, and because of the pattern of behavior over a long period of time, he did not recommend Dr. W.S.K. for medical staff membership.
Dr. Agosino made a motion that Dr. W.S.K. not be accepted for medical staff membership and privileges. This motion was seconded. Concern was expressed that the areas cited in the administrative suspension at [EGH] (nursing/staff relations, on-call availability, and compliance with Medical Record/Medical Staff policy) are all issues relating to patient care. It was felt that this behavior does not meet local standards of care. Also, the lack of a professional attitude toward nursing staff and the many instances of non-responsiveness to pages were noted.
Id. at 491. The vote on W.S.K.'s application was twelve against one in favor of denial of privileges. The one opposing the motion to deny the application had not yet read the EGH materials. On June 14, 2005, the MEC served official notice to W.S.K. of the denial of his application. On July 1 W.S.K. requested a hearing concerning the MEC's decision. The MEC's legal counsel acknowledged W.S.K.'s request on July 27.
On November 1, 2005, the MEC served notice on W.S.K. that a Fair Hearing would be held. That hearing was conducted on January 30 and February 1, 2006. Ted Waggoner, an attorney, acted as the hearing officer. The Fair Hearing Panel consisted of Dr. James Tieman, Dr. Robert Sweeney, and Dr. Ismail Al-Ani, all of whom were members of the M.H.S.B. medical staff, but none of whom had previously participated in this matter. At the hearing, both parties were represented by counsel, introduced exhibits, presented, examined, and cross-examined witnesses, and submitted proposed findings of fact and conclusions of law. Following the hearing, the Fair Hearing Panel voted unanimously to uphold the denial of W.S.K.'s application. The Fair Hearing Panel issued the following findings of fact and conclusions of law in support of its decision:
Findings of Fact:
1. The panel finds that Dr. W.S.K. knowingly filed an Application that did not disclose information required by the application.
2. That the Doctor's failures documented in the peer review file of [EGH] are comparable to the failures or mistakes involved in the application process at [M.H.S.B.].
3. The panel found that the doctor had held enough conversations with supervisory personnel at [EGH] to have been aware of the concerns that were fully documented in the [EGH] file.
4. The panel was not persuaded that the doctor's pending resignation from *683 the Elkhart Clinic was either a cause or an effect of the proceedings of the MQI Board at [EGH].
5. The panel found that the doctor failed to challenge the allegations made at [EGH], but accepted the proposed penalty, thereby leaving the allegations unchallenged in the proper forum for a resolution of such charges.
6. The panel found that the allegations of failure to respond to a page; inappropriate personnel [sic] relations with staff; one occasion of back dating medical records; failure to visit patients daily; providing patient visitation coverage, on at least one occasion, were all unchallenged and were a part of the [EGH] peer review file, and therefore are accorded a presumption of truth.
7. On several occasions, Dr. W.S.K. was given the opportunity by [M.H.S.B.] doctors, namely Dr. Kelley and Dr. Sherry, to clarify, correct and expand upon the answers made in his applications. On each occasion he failed to fully address the concerns raised.
8. Dr. W.S.K. failed to fully and accurately answer questions put before him in the application, or upon each opportunity to update or clarify his answers, such as:
* Have your employment, medical staff membership or clinical privileges at any hospital ... ever been voluntarily or involuntarily suspended, reduced, refused, revoked, relinquished, placed on probation, or not renewed, for reasons other than for completion of medical records?
* Have you ever been the subject of disciplinary proceedings or investigations at any hospital or health care facility, or are any investigations pending?
* Have you ever been the subject of focused individual monitoring at any hospital or health care facility?
* Do you have any unresolved professional review organizations or hospital quality issues or sanctions in the past or currently pending?
9. Dr. W.S.K. alleged that [M.H.S.B.] inadequately performed its duty to investigate the allegations in the [EGH] peer review file. The panel finds that the [M.H.S.B.] staff had no duty to do further investigation. It had the authority, after obtaining the specific release of the Peer Review file, but that created no duty to perform further investigation.
10. The patients who testified to the panel showed that they have been helped by the medical skills of Dr. W.S.K., and exhibited strong personal loyalty and heartfelt gratitude for his medical skills. The board found that the issue of medical skills with regard to patient care for successful patients were not questioned or challenged by the recommendation of the Medical Executive Committee. The issues of professional courtesy and responsiveness to pages may not be evident to a patient who is [sic] remission with cancer.
11. The hearing panel was impressed with Dr. W.S.K.'s attention to research and his attention to patient consultations.
12. Dr. W.S.K.'s decision to sign the incorrect or incomplete second application for privileges at M.H.S.B., which he described as a mistake, was a very serious mistake, and was an action that is not acceptable even for a busy and overworked medical doctor.

Conclusions of Law:
The hearing panel made the following conclusions of law:

*684 1. In applying for Medical Staff Membership and Clinical Privileges, Dr. W.S.K. had "the burden of producing adequate information for a proper evaluation" of the application for staff membership and clinical privileges.
2. The administration of [M.H.S.B.], in the credentials committee, medical executive committee, and board of trustees are expected to rely upon the answers of an applicant, and to weight [sic] such answers against other evidence and information that becomes available to the hospital.
3. The doctor was given several opportunities, prior to the appeal to acknowledge and clarify incomplete or inaccurate answers to the application. His failure to do so violated the medical staff bylaws, and is evidence that the doctor lacks the necessary qualifications for staff membership and clinical privileges at [M.H.S.B.]
4. The verification paragraph of the application appears to excuse "non reportable" disciplinary matters, if such matters are not reported to the medical board of Indiana or the National Practitioner Data Bank. The application also asks other questions which would require the disclosure of such events, and the doctor failed to answer these questions appropriately. While possibly meeting one loophole in this document, the applicant failed to meet all requirements of the application.
5. The doctor has objected that the administration of [M.H.S.B.] did not proof check the allegations contained in the [EGH] peer review file. Neither the fair hearing policy of [M.H.S.B.], nor State or federal law require [sic] such an investigation be performed by the hospital, while they place the burden of proving the qualifications on the applicant doctor.
6. [M.H.S.B.] staffs' failure to do more investigation than was done was not a violation of this duty.
7. Dr. W.S.K. had the burden of proving that the Medical Executive Committee's adverse recommendation lacks any substantial factual basis or the conclusions drawn therefrom are either arbitrary, unreasonable or capricious.
8. The hearing panel concludes that the MEC decision is supported by substantial fact, and the conclusions drawn from those facts are not arbitrary, capricious or unreasonable.
Id. at 927-28.
On March 26, 2006, the MEC reviewed the Fair Hearing Panel's findings and conclusions and voted unanimously to affirm the Fair Hearing Panel's recommendation that W.S.K.'s application be denied. Notice of this action was sent to W.S.K. via a Notice of Adverse Action. The MEC also advised W.S.K. of his right to request appellate review of the MEC's action. According to M.H.S.B.'s Fair Hearing Plan, appellate review was to be conducted by M.H.S.B.'s Board of Trustees (the Board) or a committee of Board members appointed by the Chairman of the Board. On March 29, 2006, W.S.K. requested appellate review of the MEC's action. Pursuant to M.H.S.B.'s Bylaws, Board Chairman Bipin Doshi appointed three members of the BoardThomas Cassady, Craig Capson, and Dr. Sandra Brownto comprise the Appellate Review Committee. W.S.K. was advised of his right to submit a written statement and was also advised that the Appellate Review Committee would entertain "oral argument and questions" by the parties at a hearing before the committee. Id. at 939.
The hearing was conducted on or about May 26 and 27. After reading all of the materials submitted in conjunction with this and the prior proceedings, the Appellate *685 Review Committee heard oral argument and questioned the parties. The Appellate Review Committee forwarded its decision to the Board in a June 1, 2006 memo, summarizing it as follows: "Based on the review of the record of the Fair Hearing, the review of the written position statements, the oral arguments, the answers to the questions of the Committee members and the deliberations, it is the unanimous decision of this Committee that the decision of the Fair Hearing Panel is affirmed." Id. at 990. The matter was then considered at a meeting of the Board. Cassady, in his capacity as a member of the Appellate Review Committee, elaborated on the committee's actions and report. After his presentation was concluded, the Board voted unanimously to uphold the decision to deny privileges.
The Board notified W.S.K. of its decision on June 22, 2006. On June 26, 2006, M.H.S.B. forwarded its Adverse Action Report to the National Practitioner Data Bank, pursuant to its reporting obligations under 45 C.F.R. § 60.9 (1994). A copy of this report was also sent to the Indiana Medical Licensing Board pursuant to its reporting obligation under Ind.Code Ann. § 16-21-2-6 (West, Westlaw through 2009 1st Special Sess.). The report noted the action taken (denial of application), and set out the following reasons:
The basis of the denial was the finding of the [M.H.S.B.] Executive Committee, upon review of the Dr. W.S.K.'s application for clinical privileges and medical staff membership and other related information, that while on staff at a prior facility, Dr. W.S.K. exhibited a pattern of unprofessional conduct, including: poor nursing/staff relations; he failed to see patients on a daily basis; he did not respond timely to pages; and he failed to comply with the prior facility's medical record policy (including post-dating progress notes). Dr. W.S.K. also failed to disclose information pertinent to this suspension on his applications for medical staff membership and privileges at [M.H.S.B.].
Id. at 1003.
As was his right, W.S.K. submitted the following statement for inclusion in the report on file with the National Practitioner Data Bank:
I dispute the factual accuracy of the above-referenced Adverse Action Report ("Report") which was submitted to the National Practitioner Data Dank [sic] ("Data Bank") by [M.H.S.B.] ("Hospital"). I also dispute whether the Report was proper to submit to the Data Bank in accordance with applicable legal and regulatory authority. For these reasons, I respectfully request that the Data Bank void the Report or otherwise require Hospital to correct the Report, for the following reasons: (1) The Report asserts a false conclusion that Dr. W.S.K. exhibited a pettern [sic] of unprofessional conduct at a third party hospital which was based on incomplete and non-reportable peer review information that Hospital not only wrongfullysolicited [sic] and received from third party hospital, but also wrongfully relied upon said information without requiring or obtaining any evidence from the third party to substantiate or otherwise validate the truthfulness or trustworthiness of the information contained in said peer review file; and (2) The Report asserts a false statement that Dr. W.S.K. failed to disclose the information regarding the allegations that were described in the above-described peer review file to Hospital as part of his application for clinical privileges, which Dr. W.S.K. and his legal counsel disproved through the introduction of evidence at hearing, all of which was ultimately disregarded by the *686 hearing panel and the Hospital's own Medical Executive Committee, appellate reviewing body and governing body, resulting in this faulty Report.
Id. at 1014-15.
On September 21, 2006, W.S.K. filed a complaint against M.H.S.B. in St. Joseph Superior Court that was subsequently amended to include seven counts on June 18, 2007. On September 8, 2007, M.H.S.B. filed a motion for summary judgment. After a hearing, the trial court granted M.H.S.B.'s motion and entered summary judgment against W.S.K. on all counts. This appeal ensued.
As indicated above, W.S.K. does not challenge the entry of summary judgment against him with respect to the allegations of intentional infliction of emotional distress, tortious interference with prospective business relationships, and tortious interference with prospective business advantage. Therefore, we are called upon to review only the trial court's rulings with respect to the theories of discrimination, defamation, and breach of contract, and upon W.S.K.'s claim that M.H.S.B. breached its "duty to conduct a fair and reasonable peer review action in connection with his application for privileges." Id. at 23.
When reviewing a ruling on a motion for summary judgment, we apply the same standard as the trial court. Sees v. Bank One, Indiana, N.A., 839 N.E.2d 154 (Ind.2005). A party seeking summary judgment must show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C); see also id. The review of a ruling on a summary judgment motion is limited to those materials designated to the trial court. T.R. 56(H); Sees v. Bank One, Indiana, N.A., 839 N.E.2d 154. We will accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmoving party, and resolve all doubts against the moving party. Sees v. Bank One, Indiana, N.A., 839 N.E.2d 154. A trial court's grant of summary judgment is clothed with a presumption of validity, and the appellant bears the burden of demonstrating that the grant of summary judgment was erroneous. Alexander v. Marion County Sheriff, 891 N.E.2d 87 (Ind.Ct.App.2008), trans. denied.

1.
W.S.K. contends the trial court erred in entering summary judgment against him with respect to his claim for race discrimination. W.S.K.'s claim of race discrimination is based upon 42 U.S.C. § 1981(a), which provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
Our Supreme Court recently clarified that there are two means of establishing liability in a race-discrimination casea single-motive theory of discrimination or a mixed-motive theory of discrimination. Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835 (Ind.2009). Under the former, a plaintiff must prove an unlawful employment practice pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Pursuant to this, the plaintiff must first establish a prima facie case of racial discrimination. Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835. If the plaintiff does so, unlawful *687 discrimination is presumed. Id. The defendant can rebut this presumption by producing evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. Id. If the defendant carries this burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination. Id. "`[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id. at 840 (quoting in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).
On the other hand, under the mixed-motive theory an unlawful employment practice may be established by showing that impermissible discrimination "played a `motivating part' or was a `substantial factor' in the employment decision." Id. (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). Under the mixed-motive theory the plaintiff need not disprove the legitimate justifications offered by the employer, but instead establish that race or some other impermissible factor was also a motivating factor in the adverse action. Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835; see also 42 U.S.C. § 2000e-2(m). To prevail in a mixed-motive case, a defendant must show by a preponderance of the evidence that it would have made the same decision regardless of the plaintiff's protected status. Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835. Direct evidence of discrimination is not required in a mixed-motive case. Id.
Following an extensive analysis of the development of unlawful discrimination law in our federal courts, our Supreme Court summarized the current test as follows:
[I]n light of [Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)], the traditional McDonnell Douglas burden-shifting paradigm requires a slight modification, but only in its final stage.... Under a modified framework, to prevail after the defendant produces a legitimate, nondiscriminatory reason for its conduct, the plaintiff must prove by a preponderance of the evidence either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (single-motive alternative), ... or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). 42 U.S.C. § 2000e-2(m). This latter showing may be made with either "direct" or "circumstantial" evidence.
Filter Specialists, Inc. v. Brooks, 906 N.E.2d at 841-42.
W.S.K. brings his claim under the second alternative identified above. In his complaint, he alleged that by denying him hospital privileges, M.H.S.B. "intentionally interfered with [his] contractual relationships with his patients, all on the basis of his race and national origin." Appendix at 21. He contends that his race was a factor in the denial of privileges. In support of this claim, he offers circumstantial evidence of discrimination by claiming he was treated differently than similarly situated applicants who were not African-Americans. He claims that from January 2001 through December 31, 2006, 251 physicians applied for medical staff or clinical privileges at M.H.S.B., and W.S.K. was the only applicant whose application was denied. W.S.K. points out that M.H.S.B. presented no evidence that it had accepted the application of an African-American physician in that time. Finally, W.S.K. *688 claims that during that time, M.H.S.B. granted privileges to "plenty of individuals with prior adverse actions and events". Appellant's Brief at 28.
The matter of comparing the treatment of W.S.K.'s application with those of other applicants to M.H.S.B. was discussed thoroughly at oral argument before this court. W.S.K. claims he was not able to review detailed records of past African-American applicants because M.H.S.B. did not identify the race of applicants in the information it provided to him. M.H.S.B. cited privacy concerns in that regard, but noted that it had provided W.S.K. with the names of all applicants during the relevant time period. W.S.K.'s counsel noted at oral argument that one cannot reliably identify an applicant's race merely from his or her name. That is surely the case, although we presume that, armed with the names of the physicians who applied, further research on W.S.K.'s part could have led to identification of the race of the individual. Be that as it may, it seems to us that the allocation of the burden of proof at this juncture in the analysis is of some importance. We therefore pause to consider this question.
Pursuant to Filter Specialists, Inc., W.S.K. was required to establish a prima facie case of racial discrimination. As noted by our Supreme Court, however, "[t]he required elements of a prima facie case may vary depending on the case." 906 N.E.2d at 839 n. 2. In McDonnell Douglas Corp., the Supreme Court determined that an employee may establish a prima facie case of employment discrimination based upon an allegation that he or she was not hired because of race by establishing that he or she (1) belongs to a racial minority; (2) applied and was qualified for a job for which the employer was seeking applicants; (3) was rejected despite his qualifications; and that (4) after the applicant was rejected, the position remained open and the employer continued to seek applicants from persons with complainant's qualifications.
W.S.K. clearly established the first elementhe is African-American. The second elementW.S.K.'s qualificationswas the subject of discussion at oral argument. W.S.K. contends he was qualified because he had obtained the necessary medical training and professional certifications and credentials. M.H.S.B. responded that W.S.K. construes the meaning of "qualified" in this context too narrowly. According to M.H.S.B., the appropriate credentials are the minimum requirements for eligibility for the granting of staff privileges, but that M.H.S.B. is free to require more than the minimum. In this case, the additional qualifications that M.H.S.B. required, and that it contends W.S.K. did not meet, concerned (1) his ability to obtain call coverage, (2) his ability to work harmoniously with hospital personnel, including nurses and other physicians, (3) his ability to follow hospital rules with respect to rounding patients and recording patient notes, and (4) his ability to respond to pages.
We agree with M.H.S.B. If we were to subscribe to W.S.K.'s interpretation, it would mean that health care facilities would be required to grant privileges to any applicant who possesses the necessary professional training and credentials, regardless of any other noncredential considerations, such as past disciplinary proceedings, prior job performance sanctions, and other relevant personal or professional concerns. Surely the Supreme Court did not intend to bind the hand of health-care providers in this fashion. In this case, prior performance and conduct were precisely the hiring criteria upon which M.H.S.B. contends its denial of W.S.K.'s application was based. Therefore, W.S.K. *689 did not establish that he was qualified for privileges at M.H.S.B. This (i.e., he was qualified) is the second of the four elements necessary to establish a prima facie case of discrimination under McDonnell. As we will discuss more fully below in Issue 2, M.H.S.B.'s determination in this regard has sufficient evidentiary support. We therefore conclude that W.S.K. did not carry his burden of establishing a prima facie case[7] that he was qualified under M.H.S.B.'s guidelines to be granted privileges at that facility and therefore also did not establish a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

2.
W.S.K. contends the trial court erred in concluding that federal and state statutes confer immunity upon the M.H.S.B. from his claims and that M.H.S.B. did not accord him due process in reviewing his application.
This issue is governed by the Health Care Quality Improvement Act (the HCQIA),[8] 42 U.S.C. §§ 11101-11152 (2006) and Ind.Code Ann. § 34-30-15-21 (West, Westlaw through 2009 1st Special Sess.), Indiana's Peer Review Statute. Pursuant to 42 U.S.C. § 11111, except with respect to civil rights actions, a professional review body "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to" "professional review actions." A "professional review action" is defined as follows:
an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.
42 U.S.C. § 11151(9). Immunity attaches under HCQIA when the review action was taken:
(1) in the reasonable belief that the action was in the furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,
(3) after adequate notice and hearing procedures are afforded to the physician *690 involved or after such other procedures as are fair to the physician under the circumstances, and
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
42 U.S.C. § 11112(a). Professional review actions are presumed to have met the preceding standards unless this presumption is rebutted by a preponderance of the evidence. Id. Thus, in this case, the burden falls upon W.S.K. to show that M.H.S.B. failed to comply with the requirements and is not entitled to immunity. Id.; see also Benjamin v. Aroostook Med. Ctr., 937 F.Supp. 957 (D.Me.1996), aff'd, 113 F.3d 1 (1st Cir.1997), cert. denied, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220.
In reviewing the grant of summary judgment concerning M.H.S.B.'s immunity under the HCQIA, our inquiry focuses on whether W.S.K. provided sufficient evidence to permit a jury to find that he had overcome by a preponderance of the evidence the presumption that M.H.S.B. would reasonably have believed it had met the standards of the immunity provision. See Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318 (11th Cir.1994), cert. denied, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220. The "reasonableness" requirement that a professional review action must meet in order for participants to qualify for immunity under the HCQIA is an objective standard of performance, rather than a subjective, good-faith standard. See Chalal v. Northwest Med. Ctr., Inc., 147 F.Supp.2d 1160 (N.D.Ala.2000), aff'd, 250 F.3d 749 (11th Cir.2001), cert. denied, 534 U.S. 891, 122 S.Ct. 207, 151 L.Ed.2d 147. Whether a defendant is entitled to immunity under the HCQIA is a question of law for the court to decide. Reyes v. Wilson Mem. Hosp., 102 F.Supp.2d 798 (S.D.Ohio 1998).
We note here that W.S.K. acknowledges his arguments under Indiana's Peer Review Statute track his arguments under the HCQIA, i.e., that "questions of fact remain as to whether the hospital is entitled to immunity under the HCQIA, and consequently then, whether it is entitled to immunity under Indiana's Peer Review Act." Appellant's Brief at 51. Thus, our analysis of W.S.K.'s claim under the HCQIA applies as well to his claim with respect to Indiana's Peer Review Statute. The critical question in this analysis is, was M.H.S.B. entitled to rely upon EGH's peer review report detailing W.S.K.'s disciplinary proceeding in considering W.S.K.'s application for privileges at M.H.S.B.? We conclude that it was.
W.S.K. contends questions of fact remain as to whether M.H.S.B. made a reasonable effort to obtain the facts of his tenure at EGH, and specifically the facts relating to his suspension and probation at that facility. According to W.S.K., M.H.S.B. did not contact anyone involved in the matters at EGH and therefore "had no direct corroboration for any of the incomplete and one-sided materials in Dr. W.S.K.'s past peer review file." Id. at 50. Essentially, W.S.K. argues that M.H.S.B. was not entitled to simply rely upon the report from EGH, but was required to independently verify the findings and conclusions contained therein. He further contends that M.H.S.B.'s decision was not prompted by a "reasonable belief that the action was in the furtherance of quality health care" because accepting the facts found in the EGH peer review report did not constitute "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(1) and (2), respectively.
W.S.K.'s argument calls into question the accuracy of the findings upon which *691 EGH's disciplinary measures were premised. That is, W.S.K. was suspended and placed on probation after the peer review process at that facility determined that he exhibited personally or professionally demeaning behavior toward nursing and other hospital staff, he was on multiple occasions unavailable while on call in the oncology nursing unit, notably failing to respond even to 911 pages, and he falsified medical records indicating he had rounded patients on a particular day when he had not, in fact, done so. W.S.K. contends M.H.S.B. should have conducted its own investigation to verify the accuracy of these findings. Although we believe M.H.S.B. certainly could have done so had it chosen to, we can find no provision of the HCQIA that compels a facility such as M.H.S.B. to conduct its own factfinding investigation to corroborate the accuracy of the facts found by a previous facility's peer or disciplinary review proceedings. That is especially so where, as here, W.S.K. accepted the disciplinary measures imposed by EGH without challenge.
In this case, M.H.S.B. was entitled to rely on the accuracy and veracity of the EGH report unless circumstances cautioned against doing so. We perceive no such circumstances present here. The EGH report documented a series of complaints against W.S.K. over a period of several years and also evinced careful consideration of the matter as reflected in the thorough, multi-layered proceedings in which W.S.K. participated. Nothing in this record should or would have put M.H.S.B. on notice that the EGH report's findings and conclusions were unreliable or suspect. Under such circumstances, we hold that M.H.S.B. was entitled to rely upon the facts found as a result of the EGH peer-review proceeding without establishing those facts anew by conducting an independent fact-finding inquiry that would, in essence, duplicate the one originally conducted by EGH.
Moreover, we observe that it would be inaccurate to say that M.H.S.B. simply based its decision on the EGH report. Instead, it offered W.S.K. an opportunity on several different occasions at several different levels of its review procedure to tell his side of the story and to rebut the findings and conclusions of the EGH peer review proceeding. Ultimately, the decision-makers at M.H.S.B. rejected W.S.K.'s alternate explanations and concluded the EGH report was accurate. M.H.S.B. was entitled to do so. Accordingly, pursuant to the HCQIA, M.H.S.B. enjoys immunity with respect to all of W.S.K.'s claims except race discrimination.
W.S.K. also claims he was not accorded adequate notice and hearing as required by the HCQIA. Although this sounds like a challenge to the adequacy of M.H.S.B.'s review procedures, it is in fact more a claim that M.H.S.B.'s ultimate decision-makers were biased against him both as a result of the EGH peer review report and, later, as a result of the adverse decisions made by the MCC and the MEC with respect to his application. Specifically, he contends he was faced with an unsustainable burden of proof under the circumstances because after the MCC and MEC had determined to deny his application for privileges, he
was not welcomed into the hospital, the hospital's fair hearing plan procedures suffocated Dr. W.S.K. with an insurmountable burden of proof: Dr. W.S.K. had to prove that the decision of the existing hospital leaders to deny his application lacked any substantial factual basis or (2) the bases or the conclusions drawn therefrom [were] either arbitrary, unreasonable, or capricious.
Id. (emphasis in original). In the end, W.S.K. contends his appeal under the Fair *692 Hearing Plan was futile, because the outcome was a foregone conclusion as a result of the earlier proceedings.
We have recited above, in great detail and at great length, the particulars of M.H.S.B.'s review of W.S.K.'s application for privileges. We need not repeat it here. It suffices to say that over a period of months, twenty-five different individuals, including twenty physicians, reviewed W.S.K.'s application and the attendant materials in a six-layered review process. All but one of the twenty-five individuals who participated in M.H.S.B.'s review proceedings voted to deny W.S.K.'s application. The only person who voted in favor of his application had not yet reviewed the EGH materials at the time. We need not resort to lengthy and detailed analysis to reach a conclusion that is readily self-evident, i.e., that those procedures were easily adequate for the purpose of providing a fair (using this term in its generic sense) hearing for W.S.K.'s application and thorough enough to reliably discover the facts relevant to that determination. Informing our conclusion in this regard is our previous determination that M.H.S.B. was entitled to rely upon the EGH report. Moreover, we also conclude that the M.H.S.B. committees and decision-making bodies up the chain in the M.H.S.B. review process, including ultimately the MEC, were entitled to rely upon the work of the M.H.S.B. committees that preceded them in reviewing W.S.K.'s application.
Alternately, and finally, on this issue, we return to the provisions of the HCQIA. 42 U.S.C. 11111(a)(1)[9] provides that immunity is conferred upon the reviewing body under the following notice-and-hearing conditions:
A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
(1) Notice of proposed action
The physician has been given notice stating
(A) (i) that a professional review action has been proposed to be taken against the physician,
(ii) reasons for the proposed action,
(B) (i) that the physician has the right to request a hearing on the proposed action,
(ii) any time limit (of not less than 30 days) within which to request such a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).
(2) Notice of hearing
If a hearing is requested on a timely basis under paragraph (1)(B), the physician *693 involved must be given notice stating
(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
(3) Conduct of hearing and notice
If a hearing is requested on a timely basis under paragraph (1)(B)
(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)
(i) before an arbitrator mutually acceptable to the physician and the health care entity,
(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;
(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;
(C) in the hearing the physician involved has the right
(i) to representation by an attorney or other person of the physician's choice,
(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
(iii) to call, examine, and cross-examine witnesses,
(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
(v) to submit a written statement at the close of the hearing; and
(D) upon completion of the hearing, the physician involved has the right
(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and
(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.
A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.
42 U.S.C. § 11112(b). W.S.K. does not contend that M.H.S.B. failed to adhere to any of the foregoing procedural requirements. Thus, M.H.S.B. is also immune from W.S.K.'s notice-and-hearing claim based upon the foregoing provision.

3.
W.S.K. contends the trial court erred in entering summary judgment against him with respect to his claim of defamation. This claim is premised upon the fact that on June 26, 2006, M.H.S.B. forwarded copies of its Adverse Action Report to the National Practitioner Data Bank and the Indiana Medical Licensing Board pursuant to its reporting obligation under I.C. § 16-21-2-6, reflecting the denial of W.S.K.'s application and the reasons therefore. We have held in Issue 2 above that under the HCQIA, M.H.S.B. is immune from liability with respect to this claim. Even if M.H.S.B. was not immune, however, W.S.K.'s claim is without merit.
A communication is defamatory if it "tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with *694 the person." Kelley v. Tanoos, 865 N.E.2d 593, 596 (Ind.2007) (quoting Rambo v. Cohen, 587 N.E.2d 140, 145 (Ind.Ct. App.1992), trans. denied). The elements of defamation include: (1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages. Kelley v. Tanoos, 865 N.E.2d 593. The determination of whether a communication is defamatory is a question of law for the court. Id. Finally, "[a]ny statement actionable for defamation must not only be defamatory in nature, but [also] false." Trail v. Boys & Girls Clubs of Nw. Ind., 845 N.E.2d 130, 136 (Ind.2006).
We begin with the last requirement, i.e., that in order to be deemed defamatory, the communication must be false. M.H.S.B.'s reports indicated that W.S.K.'s application was denied because while on staff at EGH he (1) exhibited a pattern of unprofessional conduct, including poor staff relations, (2) failed to see patients on a daily basis, (3) did not timely respond to pages, and (4) failed to comply with medical record policy, including post-dating progress notes. These assertions are truthful because they are based upon EGH's report, which documents these incidents. Moreover, W.S.K. accepted discipline pursuant to these reports without challenging them. We have concluded that M.H.S.B. was entitled to rely upon EGH's report. M.H.S.B. also reported that W.S.K.'s application was denied because he failed to divulge on his application that he had been the subject of investigation or suspension at EGH. W.S.K. acknowledges the latter assertion, but claims it was an oversight. Regardless, the statement that W.S.K. failed to report his suspension is true. Having failed to establish that the report was false, W.S.K.'s claim of defamation fails on the merits.

4.
W.S.K. contends the trial court erred in entering summary judgment against with respect to his breach of contract claim. We have held in Issue 2 above that under the HCQIA, M.H.S.B. is immune from liability with respect to this claim. Even if M.H.S.B. was not immune, however, W.S.K.'s claim is without merit.
The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. Niezer v. Todd Realty, Inc., 913 N.E.2d 211 (Ind.Ct.App.2009). The construction of a contract and an action for its breach are matters of judicial determination. Fratus v. Marion Cmty. Sch. Bd. of Trustees, 749 N.E.2d 40 (Ind.2001). Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate. Niezer v. Todd Realty, Inc., 913 N.E.2d 211. We apply a de novo standard of review when summary judgment has been granted. Id.
W.S.K. contends that M.H.S.B.'s Bylaws, Credentialing Manual, and Fair Hearing Plan constituted a contract between the parties with respect to the application process. He claims these materials obligated M.H.S.B. to follow the procedures prescribed in those materials, and thereby to exercise essential fairness in considering his application. W.S.K. contends, "`essential fairness' was a promise Dr. W.S.K. was entitled to expect, and was the only contractual term protecting Dr. W.S.K. from the risk of arbitrary, capricious, and self-interested actions of certain decision-makers at the hospital." Appellant's Brief at 39.
In support of this contention, W.S.K. cites Terre Haute Reg'l Hosp., Inc. v. El-Issa, 470 N.E.2d 1371 (Ind.Ct.App.1984), trans. denied for the proposition that in Indiana, M.H.S.B.'s Bylaws constituted a contract. Indeed, in El-Issa, this court held that hospital staff bylaws can constitute a contract between the hospital and its staff. W.S.K. acknowledges that the *695 difference between that case and this is that in El-Issa, the complainant was on the staff[10] and here, W.S.K. was not. He describes this as "a distinction without a difference." Appellant's Brief at 40-41. We disagree.
In Terre Haute Reg'l Hosp., Inc. v. El-Issa, the court determined that a contract existed because Dr. El-Issa had certain obligations under the bylaws in question with respect to his duties as a member of the staff. Of course, the hospital also had duties with respect to Dr. El-Issa's application for additional privileges. The court determined that this "mutuality of obligation" was sufficient to create a contract between the parties. Terre Haute Reg'l Hosp., Inc. v. El-Issa, 470 N.E.2d at 1377. There was no such mutuality here. Moreover, Paragraph 3.7 of the Bylaws provides as follows:
BYLAWS NOT A CONTRACT
These Bylaws and the related Manuals shall not be deemed as a contract of any kind between the Board of Trustees and the Medical Staff or any individual member thereof. Applications for, the conditions of and the duration of appointment to the Medical Staff or the granting of privileges as an Allied Health Professional shall not be deemed contractual in nature since the continuance of any such privileges at the Hospital is based solely upon a practitioner's continued ability to justify the exercise of such privileges and do not obligate the practitioner to practice at the Hospital. The Board of Trustees is obligated to use essential fairness in dealing with Medical Staff members, Allied Health Professionals and applicants for those positions and may fulfill that obligation by following the procedures specified in these Bylaws or any other procedures which are fair under the circumstances.
Appellant's Appendix at 700. In the application process, W.S.K. acknowledged that he had read all of the Bylaws and agreed to all of the provisions contained therein, which would have included Paragraph 3.7.
Moreover, as we have discussed extensively above, even assuming for the sake of argument that a contract existed, it accorded W.S.K. essential fairness in considering his application. The Bylaws define "essential fairness" in this context as "following the procedures specified in these Bylaws or any other procedures which are fair under the circumstances." Id. Thus, "essential fairness" as used here refers to the procedures to which M.H.S.B. must adhere in considering a physician's application. W.S.K. does not deny that M.H.S.B. followed the procedures prescribed in the Bylaws, Credentialing Manual, and Fair Hearing Plan. Therefore, M.H.S.B. was entitled to summary judgment on the merits of W.S.K.'s breach-of-contract claim.

5.
W.S.K. contends the trial court erred in granting in part and denying in part M.H.S.B.'s motion to strike certain materials designated by W.S.K. in opposition to summary judgment, including a deposition statement made by Dr. Rafat Ansari, and deposition statements and an affidavit submitted by Dr. Maureen Ziboh. On cross-appeal, M.H.S.B. contends the trial court erred in granting W.S.K.'s motion to strike an affidavit submitted by Carolyn Nemes.
Trial courts enjoy broad discretion in ruling on the admissibility of *696 evidence, including rulings on motions to strike affidavits. Price v. Freeland, 832 N.E.2d 1036 (Ind.Ct.App.2005). We review such rulings for an abuse of discretion. Id. Indiana Trial Rule 56(E) provides in relevant part that affidavits submitted in support of or in opposition to a summary judgment motion "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."
The trial court, on hearsay grounds, granted in part a motion to strike that was submitted by M.H.S.B. and struck designations referenced in paragraphs 57 and 61 of W.S.K.'s memorandum in opposition to summary judgment. Those paragraphs stated as follows:
57. Dr. Rafat Ansair [sic] heard rumors that the reason why Dr. W.S.K. was not admitted to M.H.S.B. Hospital was "about his relationships in the Elkhart M.H.S.B. Clinic with some people."
* * * * * *
61. After Dr. Ziboh learned that Dr. W.S.K.'s application had been denied, Dr. Ziboh spoke with Dr. Okanlami and asked why it had been denied. Dr. Okanlami stated that the denial was for two reasons: (a) Dr. W.S.K.'s "personal life", and (b) certain other physicians (specifically, Dr. Rafat Ansari) did not want the competition.
Appellant's Appendix at 2199.
W.S.K. contends the court erred in striking the above statements because they do not constitute hearsay. According to W.S.K., neither statement was "offered for the truth of the matter asserted, but rather to show the attitude and motivation of the committees in charge of reviewing Dr. W.S.K.'s application." Appellant's Brief at 58. To the contrary, the statements were offered to prove that W.S.K.'s application was denied for reasons other than the ones conveyed by M.H.S.B. to W.S.K. and expressed in the reports M.H.S.B. sent to the National Practitioner Data Bank and the Indiana Medical Licensing Board. The "attitudes and motivations" to which W.S.K. refers were precisely what he wished to prove by admitting the statements, i.e., that his applications was denied for the stated reasons. In other words, the statements constituted hearsay and were properly stricken on that basis.
Alternatively, W.S.K. contends that the statements are admissible under Ind. Evidence Rule 801(d)(2)(D), which provides, "A statement is not hearsay if ... [t]he statement is offered against a party and is... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" W.S.K. asserts that Ansari was a member of the MCC and thus "heavily involved in reviewing Dr. W.S.K.'s application". Appellant's Brief at 59. We note, however, that neither Ansari nor Okanlami participated in the review of W.S.K.'s application. Therefore, although they were members of M.H.S.B.'s staff, for purposes of this litigation these statements did not concern matters within the scope of their employment at M.H.S.B. The trial court did not err in striking their statements.
We note finally M.H.S.B.'s claim on cross-appeal that the trial court erred in striking Nemes's affidavit. In view of the fact that M.H.S.B. has prevailed in all matters of substance in this lawsuit, there is no need to address this evidentiary claim.
Judgment affirmed.
NAJAM, J., and BRADFORD, J., concur.
NOTES
[1] Oral argument in this cause was conducted in Indianapolis, Indiana on January 25, 2010. We commend counsel for their excellent presentations at this proceeding.
[2] We note that the parties also appeal what they claim was the trial court's grant of summary judgment in favor of M.H.S.B. on the issue of whether W.S.K. was entitled to judicial review of M.H.S.B.'s denial of his application. We disagree that the court so ruled. "On the issue of whether ... [W.S.K.] is entitled to judicial review", the court stated, "[i]t is more likely than not that M.H.S.B. Hospital is a private hospital and therefore Dr. W.S.K. is not entitled to judicial review of his initial staff application." Appellant's Appendix at 14. We interpret this to reflect the trial court's view that "it is more likely than not" that M.H.S.B. is a private (versus public) hospital, and therefore that "it is more likely than not" that W.S.K. was not entitled to judicial review. This equivocal language cannot be construed as announcing a decision on the merits of this issue, especially in light of our relatively stringent summary-judgment standard, which is set out later in this opinion. Rather, the court appears to have been expressing its view that M.H.S.B. might well have prevailed on that issue had the court made a determination on the merits. Indeed, had it done so, all but perhaps the race discrimination claim would have thereby been foreclosed. It appears, however, that the court chose instead to address the merits of the other claims W.S.K. presents. Acknowledging the merit of the court's observation as to the validity of M.H.S.B.'s judicial-review claim, we also proceed to review the issues decided by the trial court on the merits.
[3] From context, it is clear that "MSQIC form" refers to a form generated for the purpose of reporting a complaint against medical personnel and submitted for review and possible action to the Quality Committee. This form is officially entitled "Medical Staff Quality of Care Reporting Form" and referred to as a QOC by the Quality Committee. See id. at 433.
[4] This refers to the following rule:

All physicians must assure timely, adequate professional care for their patients in the Hospital by being available or having available, through their office or answering service, an eligible alternate physician with whom prior arrangements have been made and who has at least equivalent clinical privileges at the Hospital. Should a physician fail to name such an associate, an Officer of the Medical Staff, or Chief of the Department concerned, shall have authority to call any member of the Attending or Conditional Attending Staff to assist as needed in the situation. Failure to provide an alternate physician may lead to suspension from the Medical Staff.
Id. at 1020.
[5] This was not the first time an offer was made to allow W.S.K. to withdraw his application. Depending upon the outcome of the application process, this offer was not inconsequential. If his application was rejected, that decision and the reasons therefore were reportable to the National Practitioner Databank.
[6] We capitalize this phrase here and henceforth to underscore the fact that "fair" is not to be understood merely as a generic adjective describing the sort of hearing to which W.S.K. was entitled, if indeed he was entitled to such. Rather, "Fair Hearing" in this opinion is to be understood as referring to a specific type of hearing characterized by the due process considerations to which W.S.K. was entitled.
[7] We reiterate, "`the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff'" Filter Specialists, Inc. v. Brooks, 906 N.E.2d. at 840 (quoting in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).
[8] Relevant to the issues we consider in the instant case, the HCQIA includes this statement of purpose:

The Congress finds the following:
(1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.
(2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.
(3) This nationwide problem can be remedied through effective professional peer review.
(4) The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.
(5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.
U.S.C. § 42-11101(a)(1).
[9] If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section

(A) the professional review body,
(B) any person acting as a member or staff to the body,
(C) any person under a contract or other formal agreement with the body, and
(D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. The preceding sentence shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. and the Civil Rights Acts, 42 U.S.C. 1981, et seq. Nothing in this paragraph shall prevent the United States or any Attorney General of a State from bringing an action, including an action under section 15c of title 15, where such an action is otherwise authorized.
[10] Dr. El-Issa was a member of the staff of Terre Haute Regional Hospital (THRH). While a staff member, he received continuing education credits to perform procedures he had not theretofore been qualified to perform. Once certified to perform such procedures, he applied for privileges to perform those procedures at THRH. His application was denied and he appealed.