ATTORNEY FOR APPELLANT
John R. Price
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Robert B. Clemens
George T. Patton
Bryan H. Babb
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
Linda J. Cooley
Indiana Association of School Principals

David R. Day
Indiana Association of Public School
Superintendents

Joseph K. Etling
Indiana Urban Schools Association and
Vigo County Administrators Association

A. Howard Williams
Indiana Sheriffs Association, and the Vigo
County Sheriff's Department

Kendall Boyd
City of Terre Haute (Police Dept.), and the
City of Terre Haute (Mayor's Office)

C. Russell Cox
Indiana Association of Chiefs of Police, Inc.

Bruce D. Aukerman
National Association of School Resource
Officers, and the International Union of
Police Associations

_____

# In the
# Indiana Supreme Court

_____

No. 84S01-0605-CV-195

PAUL JOSEPH "JAY" KELLEY, III,

*Appellant (Plaintiff below)*,

v.

DANIEL T. TANOOS,

*Appellee (Defendant below)*.

_____

Appeal from the Vigo Superior Court, No. 84D03-0212-CT-9399
The Honorable David R. Bolk, Judge

**May 2, 2007**

**Sullivan, Justice.**

Daniel Tanoos believed that Paul Kelley had been the unidentified gunman who had fired a shotgun at him, though Kelley was never charged. While the police were investigating the incident, and with their knowledge and cooperation, Tanoos made accusatory statements about Kelley in a private conversation with the head of the school where Kelley worked. When Kelley learned of the statements, he sued Tanoos for defamation. We hold that Tanoos is protected from liability for defamation in these circumstances because the statements were made to assist law enforcement investigate criminal activity.

## Background

On January 17, 2001, a bullet grazed the head of Daniel T. Tanoos, Superintendent of the Vigo County School Corporation ("School Corporation"), when someone fired a shotgun at him from outside his house. The police identified Paul "Jay" Kelley as a suspect because of his known animosity toward Tanoos. At the time of the incident, Kelley was Supervisor of Safety and Security at the Gibault School, a juvenile residential treatment facility also in Vigo County. James Sinclair was the Executive Director and Chief Executive Officer of Gibault, Inc.

The day after the shooting, there were rumors on the Gibault campus that Kelley was a suspect. The police came to Gibault School and interviewed some of Kelley's fellow employees. When police contacted Gibault a second time and indicated that they would like to speak to some Gibault employees again, they were told they should interview the employees on their own time rather than while the employees were working. This led to a rumor that Gibault was not cooperating with the police investigation and strained relations between the School Corporation and Gibault School. Concerned, Sinclair sent Tanoos a letter suggesting they meet.

Tanoos called the police, who expressed interest in the meeting because Kelley would be a topic of discussion. The police gave Tanoos questions to ask and a wire to wear so that the conversation could be recorded. At the meeting, which occurred on December 21, 2001, Tanoos attempted to coax information from Sinclair. In particular, Tanoos made the following statements about Kelley:

> "I'm as convinced as the police are that Jay Kelley did it."

> "Well, the issue with the polygraph is that he took it four times and failed it three times."

> "It's all circumstantial, but it all leads back to him."

> "He—I could throw you on to some other people the police looked at through different things and all—all of a sudden all the things they were hearing—everything just started pointing to him."

Kelley was never charged with any crime arising from the shooting incident. On December 10, 2002, Kelley filed a lawsuit for defamation against Tanoos. He subsequently learned of the taped conversation during the trial of one Marty Ketner, who was identified as a suspect in February 2002, tried, and acquitted. The parties filed cross-motions for summary judgment. The trial court, without findings of fact or conclusions of law, granted Tanoos's motion and denied Kelley's.

The Court of Appeals reversed and remanded, holding that genuine issues of material fact existed regarding Kelley's defamation claim and that Tanoos's statements were not covered by a qualified privilege. Kelley v. Tanoos, 840 N.E.2d 342 (Ind. Ct. App. 2005). Tanoos, supported by law enforcement and several amici, sought, and we granted, transfer. Kelley v. Tanoos, 855 N.E.2d 1009 (Ind. 2006) (table).

3

## Discussion

## I

A defamatory communication is one that "tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." Rambo v. Cohen, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992), trans. denied. The framers of the Indiana Constitution placed high value on reputation. Our Constitution provides that "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Ind. Const. art. I, § 12. Whether a communication is defamatory or not is a question of law for the court, unless the communication is susceptible to either a defamatory or nondefamatory interpretation — in which case the matter may be submitted to the jury. Rambo, 587 N.E.2d at 145.

A defamatory communication is said to either be "defamatory per se" or "defamatory per quod." A communication is defamatory per se if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct. Id. (citing cases). All other defamatory communications are defamatory per quod. Id. at 146. To maintain an action for either per se or per quod defamation the plaintiff must demonstrate (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. Schrader v. Eli Lilly and Co., 639 N.E.2d 258, 261 (Ind. 1994). Actions for per se and per quod defamation are susceptible to different requirements with regard to the showing of damages. In an action for defamation per se the plaintiff "is entitled to presumed damages 'as a natural and probable consequence' of the per se defamation." Rambo, 587 N.E.2d at 145 (citing Elliott v. Roach, 409 N.E.2d 661, 683 (Ind. Ct. App. 1980)). In an action for defamation per quod, the plaintiff must demonstrate special damages. Id. at 146 (citing cases).

Kelley maintains that the requirements for maintaining an action for defamation per se have been met in this case. In the Court of Appeals, Tanoos argued that he was properly awarded summary judgment because at least three of the four elements for a defamation action were not present. The Court of Appeals disagreed, and found instead that (1) Tanoos's state-

4

ments were defamatory per se; (2) Kelley had designated sufficient evidence to raise a question of fact as to whether Tanoos made the defamatory remarks with malice; and (3) that the record overwhelmingly supports the contention that Kelley was not damaged. Kelley, 840 N.E.2d at 347-48. Despite finding no evidence that Kelley sustained any damages at all, the Court of Appeals did not affirm the grant of summary judgment in favor of Tanoos because, as stated supra, in a per se action for defamation, damages are presumed and, per Ind. Evidence Rule 301, even rebutted presumptions are given continuing effect. Id. at 350-49; Schultz v. Ford Motor Co., 857 N.E.2d 977 (Ind. 2006).

On transfer, Tanoos asks this Court to abolish the presumption of damages in an action for defamation per se, and grant summary judgment in his favor. We decline Tanoos's invitation to abolish the presumption of damages in an action for defamation per se; instead, we resolve this case under the qualified privilege doctrine.

## II

A qualified privilege protects "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." Bals v. Verduzco, 600 N.E.2d 1353, 1356 (Ind. 1992) (quoting Chambers v. American Trans Air, Inc., 577 N.E.2d 612, 615 (Ind. Ct. App. 1991), trans. denied.). To "enhance[] public safety by facilitating the investigation of suspected criminal activity," communications to law enforcement officers are protected by this qualified privilege. Holcomb v. Walter's Dimmick Petroleum, 858 N.E.2d 103, 108 (Ind. 2006). In the absence of a factual dispute, the applicability of the privilege is a question of law to be determined by the court. Bals, 600 N.E.2d at 1356.

## A

Our courts have recognized two distinct rationales for holding certain communications qualifiedly privileged. The first is the well-established common interest privilege that protects

5

communication made in connection with membership qualifications, <u>Indianapolis Horse Patrol Inc. v. Ward</u>, 247 Ind. 519, 217 N.E.2d 626 (1966); employment references, <u>Passmore v. Multi-Management Services Inc.</u>, 810 N.E.2d 1022 (Ind. 2004); intracompany communications, <u>Schrader</u>, 639 N.E.2d at 258; and the extension of credit, <u>Boydston v. Chrysler Credit Corp.</u>, 511 N.E.2d 318 (Ind. Ct. App. 1987). This privilege is intended to facilitate "full and unrestricted communication on matters in which the parties have a common interest or duty." <u>Chambers</u>, 577 N.E.2d at 615.

Tanoos contends that his statements to Sinclair are protected by the common interest privilege. To support this contention, Tanoos argues that both he and Sinclair were executives in partnered education institutions, that Sinclair employed Kelley as a school guard, and that tension between the School Corporation and Gibault had arisen as a result of Gibault's refusal to cooperate with the police investigation. (Appellee's Br. at 20.) Chiefly, Tanoos argues that both he and Sinclair share a common interest "in discerning the potentially violent propensities of an individual guarding school-age Vigo County community children . . . ." <u>Id.</u>

As stated by the court in <u>Elliott v. Roach</u>:

> In viewing such arguments, this court is cognizant not only of the broad legal categories represented by such terms as "interest" and "duty," but also of an underlying consideration whenever privilege is alleged—namely, whether the evidence shows the defamer in fact acted for a privileged purpose and in good faith. It has properly been held
>
>> "The privilege attaches only if the communication was made in good faith to serve the interests of the publisher and the person to whom it is addressed, and it does not exist if the privileged occasion was abused. There is no privilege if the publication was made primarily for the purpose of furthering an interest that is not entitled to protection, or if the defendant acted principally through motives of ill will, or, so it is held, if he acted recklessly. Whether a defendant acted in good faith in making a statement usually is a question of fact for the jury."

409 N.E.2d at 673 (<u>quoting</u> 50 Am. Jur. 2d <u>Libel and Slander</u> § 197 at 702-03 (1970)).

There is a limit to the scope of protection available under the qualified privilege doctrine. A communication otherwise protected by a qualified privilege may lose its protection if it is shown that: "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." Bals, 600 N.E.2d at 1356. "And although the term 'malice' is frequently applied in viewing such acts, it appears 'the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which privilege exists.'" Elliott, 409 N.E.2d at 673 (quoting Weenig v. Wood, 169 Ind. App. 413, 349 N.E.2d 235, 249 (1976), trans. denied.).

It is evident that the legal question of a shared interest or duty must be answered before the associated factual question of whether the defamer acted for a protected purpose. See id. In this case, we are unable to conclude that Tanoos's statements to Sinclair are protected by the common interest privilege because there is evidence that the interests of Tanoos and Sinclair are not sufficiently concurrent to make Tanoos's statements qualifiedly privileged.

Here, there is substantial evidence that Tanoos's principal interest in making the statements was in having his attempted murderer apprehended, while Sinclair's principal interest was in repairing strained relations between the School Corporation and Gibault. Even assuming Tanoos acted from less subjective motives, absent a more particular shared interest, protecting himself or school-age Vigo County community children does not give rise to the protection of a privilege. See id. at 678.

To illustrate, compare Gatto v. St. Richard School, Inc., 774 N.E.2d 914 (Ind. Ct. App. 2002), a case Tanoos cites for support to this one. In Gatto, the common interest privilege was held to have applied to a school's communication to students' parents about the termination of a school employee. There, the court reasoned, "Parents and schools have a 'corresponding interest' in the free flow of information about administrators and faculty members." Gatto, 774 N.E.2d at 925. The school's communication to parents was privileged because both the parents' and the school's interest was particular to a discrete group of children and the alleged defamatory statements were relevant to that particularized interest.

7

The relationship between the concurrent interest and the defamatory remarks found in Gatto and in comparable cases is not readily apparent in the case before us.[1] In Gatto the parents and the school officials shared a joint interest in the welfare of particularized children. Here, Tanoos shares no special relationship with Gibault students. The only interest, if any, Tanoos has for Gibault students is a generalized interest in their wellbeing. Even assuming, arguendo, that Tanoos and Sinclair shared a joint interest in repairing strained relations between the School Corporation and Gibault, Tanoos's remarks to Sinclair regarding Kelley were not, as a matter of law, relevant to that interest. In sum, "The information [Tanoos] profess[ed] to [provide] was volunteered, and the purpose for which it was conveyed to [Kelley's] employer was solely for the benefit of [Tanoos], and was not intended to benefit the employer by giving him, in good faith and for a just purpose, information necessary for his protection against a knavish servant." Over v. Schiffling, 102 Ind. 191, 26 N.E. 91, 92 (1885).

Accordingly, we conclude that Tanoos's statements to Sinclair are not protected by a common interest privilege as a matter of law. We believe that to hold otherwise would bring within the common interest privilege in future cases communications not entitled to protection given the purpose of the privilege.

**B**

In addition to the common interest privilege, Indiana courts have also recognized what section 598 of the Restatement (Second) of Torts (1977) calls a "public interest privilege."[2] In

---

[1] Tanoos argued to the Court of Appeals and argues to this Court that Celebration Fireworks Inc., v. Smith, 727 N.E.2d 450 (Ind. 2000), supports application of the common interest privilege. This case, however, is distinguishable both by the facts and by the applicable legal principles. In Celebration, the Court noted that the defendant was "plainly . . . on public time, performing a function that was central to the position he held." Celebration 727 N.E.2d at 453. In this case, Tanoos was not "plainly" on public time, as the conversation between him and Sinclair occurred over lunch and it is questionable whether furthering a police investigation into his attempted murder by wearing a wire is central to his duties as a school superintendent.

[2] Section 598 of the Restatement reads:

§ 598. Communication to One Who May Act in the Public Interest

8

Elliott v. Roach, the court, quoting the Restatement, noted that the public interest privilege "may protect communications made to one entitled to act in the public interest, as in the case of statements to . . . law enforcement officers." Elliott, 409 N.E.2d at 672. In Conn v. Paul Harris Stores, Inc., 439 N.E.2d 195, 200 (Ind. Ct. App. 1982), trans. denied, the court recognized a conditional privilege that extended to "protect statements and communications made to law enforcement officers." That court, relying on authority outside of Indiana, said "statements made in good faith pursuant to investigation by police of a crime are made in the performance of a public duty and are privileged." Conn, 439 N.E.2d at 200 (quoting Zakas v. Mills, 251 S.E.2d 135, 136 (Ga. Ct. App. 1978)). In Indiana National Bank v. Chapman, 482 N.E.2d 474, 479 (Ind. Ct. App. 1985), trans. denied, the court relied on Elliott and Conn to find that statements made to the police "during the course of a legitimate law enforcement investigation" are qualifiedly privileged. The policy rationales articulated in these Court of Appeals cases were recently endorsed by this Court in Holcomb v. Walter's Dimmick Petroleum. In Holcomb, this Court held that statements made to a police officer to report a crime were qualifiedly privileged to "enhance[] public safety by facilitating the investigation of suspected criminal activity." Holcomb, 858 N.E.2d at 108. Accordingly, it is well established that in Indiana, communications made to law enforcement to report criminal activity are qualifiedly privileged. This so-called public interest privilege is intended to encourage private individuals to assist law enforcement with investigating and apprehending criminals.

The Restatement, under the purview of the public interest privilege, articulates a broader scope of protection than adopted in Indiana:

> The privilege stated in . . . Section [598] affords protection to a private citizen who publishes defamatory matter to a third person even though he is not a law enforcement officer, under circumstances which, if true, would give to the re-

---

An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
    (a) there is information that affects a sufficiently important public interest, and
    (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

Restatement (Second) of Torts § 598 (1977).

cipient a privilege to act for purposes of preventing a crime or of apprehending a
criminal or fugitive from justice.

Restatement (Second) of Torts § 598 cmt. f (1977).

As stated supra, Indiana courts have not adopted this reading of the public interest privilege and, therefore do not protect such communications to private citizens. Tanoos, through his amici, asks us to extend the public interest privilege to cover communications to private citizens, and to extend its protection to him.

We agree with the amici and the Restatement and think the public interest privilege, under a limited number of circumstances, protects communications to private citizens. Statements reporting criminal activity to law enforcement, as stated supra, are privileged to enhance public safety by facilitating the investigation of suspected criminal activity. We think certain statements to private citizens may further the same end.

In Pate v. Service Merchandise Co., Inc., the Tennessee Court of Appeals adopted this view of the public interest privilege and held that a store clerk who reported suspicious criminal activity to a private security guard and theft victim was protected by the public interest privilege. That court reasoned:

> [E]ven though the investigation was not conducted by the local police, the investigation by the security department could have led to the apprehension of the criminal. It is reasonable for anyone in the position of the clerks to believe that the identification would affect the public interest of preventing crime. The public interest privilege is grounded in public policy, and we should encourage cooperation with an investigation of a criminal matter.

Pate v. Service Merchandise Co., Inc., 959 S.W.2d 569, 576-77 (Tenn. Ct. App. 1996).

Just as statements to law enforcement further a public interest, similar statements made to a private citizen may further the same interest. That interest is grounded in a public policy intended to encourage private citizens and victims not only to report crime, but also to assist law enforcement with investigating and apprehending individuals who engage in criminal activity.

The rationale for privileging communications to law enforcement and to certain private citizens is applicable here. Tanoos's statements, made at least in part at the behest of law enforcement, to Sinclair were designed to elicit information about Kelley to further an ongoing criminal investigation. It is reasonable to conclude that when law enforcement and the victim of a crime work in concert, the likelihood of apprehending the perpetrator of the crime increases. As noted by the court in Pate, "The victim of a crime has the unfortunate privilege of acting to apprehend a criminal. Most times it would be impossible for the police to successfully investigate and apprehend criminals without the actions of the victim." Id. at 577. Accordingly, we hold that Tanoos's statements to Sinclair are qualifiedly privileged by the public interest privilege as a matter of law.

As noted supra, a communication otherwise protected by a qualified privilege may lose its protection if it is shown that: "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." Bals, 600 N.E.2d at 1356.

If a communication is found to be qualifiedly privileged, the burden is on the plaintiff to show that the privilege has been abused. Id. Unless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury. Id. at 1357 (quoting William Prosser, Law of Torts § 115, at 796 (4th ed. 1971)).

Kelley argues that if Tanoos's statements are qualifiedly privileged, Tanoos lost the privilege because he used the privileged occasion for an improper purpose. Kelley designated the deposition testimony of Indiana State Police Detective Turchi and Terre Haute Police Captain Erney to support his contention that Tanoos exceeded the number and type of questions law enforcement requested he ask Sinclair. The designated evidence, however, fails to support Kelley's argument. Law enforcement, in addition to asking Tanoos to elicit particular information, also asked him to elicit whatever relevant information he could from Sinclair. Thus, contrary to Kel-

ley's contention, law enforcement did not limit the number or type of questions they requested Tanoos ask Sinclair.

Kelley also contends that Tanoos did not believe or have reason to believe certain statements he made to Sinclair. Kelley says, "at the time Tanoos made [the] statements . . . he knew they were false, and he knew that the police had ruled out Kelley as a 'person of interest.'" (Appellant's Br. at 42.) To support his contention that Tanoos did not believe the alleged defamatory statements, Kelley designates Tanoos's testimony at the Ketner trial:

> Q: All right. Did you become convinced after the shooting that Jay Kelley was the one who shot you?
>
> A: No.
>
> . . . .
>
> Q: Do you recall telling Mr. Sinclair during the conversation: "I'm convinced from all that I've seen and heard it was him."
>
> A: I don't recall that statement, I may have tried to get him to say something at that point and use that statement, I don't recall that.
>
> . . . .
>
> Q: You [m]ay have said it, but you didn't believe it?
>
> A: My point at that time again was to try to—as I met with the police they asked me to ask certain questions to try to see why he wanted to meet with me and see what information he had, so I was going on what the police had asked me to do.
>
> Q: So, were you telling Mr. Sinclair false things or things that you didn't believe, trying to act as some sort of informant or interviewer?
>
> A: I was trying to find out why he wanted to meet with me and what he had to offer for the meeting that he had asked me to attend.

(Appellant's App. at 497, 502-03.) To rebut Kelley's argument, Tanoos designates testimony that he says places the alleged defamatory statement in proper context:

Well, I think through what the police have found it was not random. I mean – I think they're convinced – I'm as convinced as the police are that Jay Kelley did it.

(Appellee's Br. at 25.) We agree with Tanoos, and think when read in context the testimony designated by Kelley does not demonstrate that Tanoos's statement to Sinclair, that he and the police both were "convinced that Jay Kelley did it," was made without belief or grounds for belief as to truth. As noted by this Court in Bals v. Verduzco, the issue is not the factual accuracy of the statements; "the crucial issue is whether the alleged defamations were made . . . without belief or grounds for belief as to truth." Bals, 600 N.E.2d at 1357. If the police and Tanoos did not believe Kelley was involved in the incident and if the police no longer considered Kelley a "person of interest," then Tanoos would likely not have telephoned the police after receiving a lunch invitation from Sinclair and the police very likely would not have expressed interest in the meeting between Tanoos and Sinclair and would not have asked Tanoos to wear a wire. Because Kelley has failed to designate evidence that demonstrates Tanoos abused the privileged occasion, summary judgment is appropriate.

## Conclusion

We affirm the judgment of the trial court with respect to its decision to deny Kelley's motion for summary judgment and to grant summary judgment in favor of Tanoos.

Shepard, C.J., and Dickson, Boehm, and Rucker, JJ., concur.