

IN THE

# Court of Appeals of Indiana

Club Newtone, Inc., and Marc Vaughn,

*Appellants-Defendants*



FILED

Oct 20 2025, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Jarissa Gillaspy,

*Appellee-Plaintiff*

---

October 20, 2025

Court of Appeals Case No.
24A-CT-1239

Appeal from the Tippecanoe Circuit Court

The Honorable Sean M. Persin, Judge

Trial Court Cause No.
79C01-2108-CT-130

---

**Opinion by Judge Kenworthy**
Judges Bradford and Pyle concur.

**Kenworthy, Judge.**

## Case Summary

Jarissa Gillaspy ("Gillaspy") brought a sexual harassment lawsuit in federal court against her former employer, Club Newtone, Inc. ("Newtone")[1] and its owner Marc A. Vaughn ("Vaughn") (collectively, "Defendants"), in which she alleged Vaughn sexually assaulted her. Vaughn counterclaimed for slander and libel. Vaughn eventually dismissed his countersuit, but not before Gillaspy filed this action against Defendants in state court alleging their federal counterclaims constituted malicious prosecution and abuse of process.

This case proceeded to trial; the jury found in favor of Gillaspy and awarded her $2.5 million in damages. Defendants now appeal, raising the following consolidated and reordered issues:

1. Did the trial court abuse its discretion in admitting Gillaspy's testimony that she was sexually abused as a child and accused of lying about it?

2. Was the evidence insufficient to support the jury's verdict and were the awarded damages excessive?

We affirm.

---

[1] In the record, the entity is sometimes styled "Club NewTone, Inc." We adopt the capitalization and shorthand used in the trial transcript.

## Facts and Procedural History

[4] In 2018, Vaughn was the owner, president, and CEO of Newtone, a physical fitness gym in Lafayette. Vaughn also owned MJV Group, Inc. ("MJV"), which managed the business operations of Newtone, among other activities. Gillaspy was a personal trainer, fitness instructor, and group fitness coordinator at Newtone. Gillaspy often provided personal training sessions to Vaughn and his then-girlfriend, Kari, with whom he lived at the time.

[5] While Gillaspy worked at Newtone, Vaughn frequently made remarks about her appearance, such as telling her "how good [she] look[ed]," making "really uncomfortable flirty type [in]nuendos," and confessing "he liked to watch [her] lift [weights] from behind." *Tr. Vol. 4* at 54, 55. One time, during an out-of-town trip to an industry trade show, Vaughn invited Gillaspy to "hang out" one-on-one in his room while Kari was "passed out." *Id.* at 54. Gillaspy did not respond. Another time, when Gillaspy went out to a social dinner with Vaughn and Kari, Vaughn got "uncomfortably" close and touched Gillaspy's leg whenever Kari went to the bathroom. *Id.* at 55.

[6] On February 12, 2018, Vaughn asked Gillaspy to conduct a personal training session the next morning at his home while Kari was gone. Gillaspy agreed to train Vaughn before teaching an 8:30 a.m. group fitness class at the gym. When Gillaspy arrived at Vaughn's house on February 13, she knocked but received no answer. The door was unlocked, so she let herself in and called out to Vaughn. He answered from the bedroom. Gillaspy went to the room, where she found Vaughn awake but still in bed. After she sat down on the corner of

the bed, Vaughn grabbed her from behind, pulled her down onto the bed, and got on top of her. He attempted to kiss her and pull down her pants. Gillaspy told him to stop, resisted his efforts to kiss her, and alternated between pushing him away, blocking her face, and trying to hold up her pants. Vaughn did not stop. He shoved his tongue into her mouth and tried to wedge his leg between her legs. Gillaspy continued to fight back. While Gillaspy was pinned underneath him, Vaughn began masturbating; eventually, he said he would "just finish himself in the shower" and got up. *Id.* at 65. Gillaspy quickly got up to leave. Vaughn followed her to the door and tried to pull her to him and kiss her, which she again resisted. Gillaspy arrived at the gym "[v]ery distraught" and late for her class. *Tr. Vol. 3* at 169. Several class members noticed she was not acting like herself.

[7] Two days later, Gillaspy reported the incident to her Newtone supervisors. They compiled a written report and told Gillaspy to have no further contact with Vaughn. In August, Gillaspy filed a charge of discrimination with the Indiana Civil Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC"). Shortly thereafter, Newtone implemented monthly minimum sales goals for personal trainers. Because Gillaspy worked as both a personal trainer and group fitness instructor, she could not meet the new requirements. Newtone terminated her employment sometime in spring 2019. In December 2019, Gillaspy went to work as a personal trainer at a new gym, VASA Fitness ("VASA"). In 2020, Newtone closed its doors and sold its assets to VASA.

[8] In March 2020, after the EEOC issued Gillaspy a notice of right to sue letter, Gillaspy filed suit against Defendants and MJV in the United States District Court for the Northern District of Indiana alleging sexual harassment, hostile work environment, and retaliation.[2] In her complaint, Gillaspy alleged Vaughn "forcefully confined [her], attempted to force himself between her legs, kissed her, and masturbated." *Ex. Vol. 1* at 117. When Defendants filed their answer on April 16, Vaughn counterclaimed for libel *per se* based on that sentence in the complaint and slander *per se* based on the allegation Gillaspy made false and defamatory oral statements in the presence of third parties that "Vaughn raped and/or attempted to rape" her. *Id.* at 165. In a third counterclaim, Defendants alleged Gillaspy breached a noncompete agreement by going to work for VASA. In Defendants' initial disclosures, they asked for general and actual damages of over $1.2 million, plus punitive damages of $900,000.

[9] In July 2020, the parties jointly stipulated to the dismissal of "Vaughn **only**" from the federal lawsuit, and the district court permitted Gillaspy to amend her complaint to voluntarily dismiss any claim against Vaughn personally. *Ex. Vol. 2* at 26. Over a year later, on September 22, 2021, Vaughn formally moved to dismiss his counterclaims against Gillaspy with prejudice, which the district court granted a few months later.

---

[2] In the original complaint, she also brought an assault and battery claim against Vaughn and claims of intentional infliction of emotional distress, negligence, and negligent retention against all three defendants. After the defendants moved to dismiss those claims as barred by the statute of limitations, Gillaspy dropped those claims in an amended complaint filed in April.

[10] About a month before Vaughn formally dismissed his counterclaims, Gillaspy filed this action against Vaughn for malicious prosecution and Defendants for abuse of process.[3] In her amended complaint, Gillaspy alleged Vaughn acted maliciously and without probable cause in bringing the federal counterclaims, and Defendants pursued the counterclaims "in clear retaliation for Gillaspy's claims, for Gillaspy's whistleblowing, and [in] an attempt to intimidate Gillaspy." *Appellant's App. Vol. 2* at 28.

[11] A three-day jury trial began on February 27, 2024. The parties agreed the resolution of Gillaspy's malicious prosecution claim depended in part on whether Vaughn had probable cause to countersue for defamation in the federal lawsuit;[4] and further, the existence of probable cause depended on whether Gillaspy made false and defamatory statements when she alleged Vaughn engaged in sexual misconduct.[5] *See, e.g., Tr. Vol. 2* at 92 (defense attorney

---

[3] Gillaspy also sued Newtone and VASA for violations of the Indiana Fraudulent Transfers Act, alleging Newtone intended to defraud Gillaspy when Newtone sold its assets to VASA. Gillaspy eventually abandoned or dismissed the fraudulent transfers claim and filed a notice of dismissal as to VASA.

[4] The essence of malicious prosecution rests on the notion that the plaintiff has been improperly subjected to legal process. *City of New Haven v. Reichhart*, 748 N.E.2d 374, 378 (Ind. 2001). There are four elements of a malicious prosecution claim: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted with malice in doing so; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor. *Id.*

[5] "The tort of defamation includes libel and slander. While libel and slander are both forms of defamation, 'libel' is written and 'slander' is oral." 50 Am. Jur. 2d *Libel and Slander* § 1 (2025). A defamatory communication tends to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person. *Kelley v. Tanoos*, 865 N.E.2d 593, 596–97 (Ind. 2007). "A communication is defamatory per se if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Id.* Truth "is a complete defense in civil actions for defamation." *Melton v. Ousley*, 925 N.E.2d 430, 437 (Ind. Ct. App. 2010).

arguing at a pretrial conference the morning of trial, "if those things didn't happen and he's being accused of that, then he has probable cause. And so it's figuring out whether or not what happened in the room that morning is what the finder of fact needs to determine"). Gillaspy therefore testified in detail about the events on February 13. Gillaspy also called two former Newtone employees to testify, who stated Vaughn persistently made comments about their appearances or made sexual advances toward them.

[12] Gillaspy also sought to testify she was sexually abused as a child and accused of lying about it. Gillaspy offered this testimony to explain why she was hesitant to report Vaughn's conduct. Over defense counsel's objection, the trial court permitted limited testimony about the abuse as relevant and not unduly prejudicial to Defendants.

[13] At the conclusion of evidence, the trial court instructed the jury on the scope of compensatory damages it could award if it found in Gillaspy's favor. The trial court's final instructions included an "eggshell skull" instruction stating, in part, that a "defendant is thus liable to the extent that their conduct aggravates a pre-existing condition, but is not liable for damages stemming from a pre-existing injury that independently causes harm." *Appellee's App. Vol. 2* at 16.

[14] At the conclusion of trial, the jury returned a verdict for Gillaspy and awarded damages of $2.5 million. Defendants indicated they intended to move for judgment on the evidence. Over Defendants' objection, the trial court entered judgment in accordance with the verdict. On March 15, Defendants sought

judgment on the evidence in a Trial Rule 59 motion to correct error, arguing the jury verdict was unsupported by the evidence and excessive. The trial court denied Defendants' motion.

## The trial court did not abuse its discretion in admitting Gillaspy's testimony about childhood sexual abuse.

[15] We begin with whether the trial court abused its discretion in admitting Gillaspy's testimony that she was the victim of childhood sexual abuse. Generally, relevant evidence is admissible. *See* Ind. Evidence Rule 402. But a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403. "We trust issues of admissibility to the sound discretion of our trial judges, and we review their evidentiary rulings for an abuse of discretion." *State Farm Mut. Auto. Ins. Co. v. Earl*, 33 N.E.3d 337, 340 (Ind. 2015). An abuse of discretion occurs "where the trial court's decision is against the logic and effect of the facts and circumstances before it." *Id*. If we find inadmissible evidence was improperly placed before the jury, we only reverse if that error was clearly prejudicial. *Id*.

[16] Gillaspy sought to introduce testimony that she was sexually abused as a child, in part to explain her reluctance to disclose or report to authorities the February 13 incident. *Tr. Vol. 4* at 101. Earlier in her testimony, Gillaspy stated she did not want to tell anyone about Vaughn's misconduct because "as soon as I

would tell somebody, then I'd feel like I would be called a liar and I would lose my job." *Id.* at 66.

[17] Although Defendants conceded the proffered evidence was relevant, they argued such testimony would be unfairly prejudicial to them because it would only "inflame the jurors more about . . . the alleged sexual assault." *Id.* at 100. After a side-bar conference, the trial court found the testimony was relevant and would not be unfairly prejudicial to Defendants because the prior abuse did not reflect poorly on Vaughn. But the trial court declined to permit Gillaspy to testify about how the prior abuse may have impacted any injuries she sustained as a direct result of Vaughn's sexual misconduct, finding such testimony would confuse the jury by suggesting they could award damages directly for sexual misconduct, rather than malicious prosecution and abuse of process.

[18] When trial resumed, Gillaspy testified that when she was in first or second grade, a teenage family member by marriage (her stepbrother's brother-in-law) put his fingers in her mouth and "would rub himself on [her]" when she stayed the night at her stepbrother's house. *Id.* at 108. When Gillaspy told her stepmother several years later, the stepbrother's in-laws accused her of lying. The allegations caused a family rift, and she "never got to visit [her stepbrother and his family] anymore." *Id*. at 109. When Gillaspy's counsel tried to ask Gillaspy whether being touched by someone without consent had any impact on her ability to "speak up," Defendants objected, and the trial court sustained the objection. *Id.* at 110. Gillaspy's counsel then asked her why she did not

report Vaughn's misconduct to the police. She responded, "I didn't want to tell anybody." *Id*. at 111.

[19] On appeal, Defendants argue Gillaspy's testimony was unfairly prejudicial because it confused the jury about "whether Vaughn was responsible for Gillaspy's prior trauma and new trauma" and induced them to award damages for prior sexual abuse, rather than malicious prosecution and abuse of process. *Appellants' Br.* at 29. But our review of the record shows the trial court carefully engaged in Evidence Rule 403 balancing by excluding testimony that may confuse the issues or mislead the jury. The testimony the trial court admitted was limited to the fact that a third party previously sexually abused Gillaspy and accused her of lying about it; the trial court did not permit her to testify about how the prior abuse—as opposed to the accusation of lying—affected her. The admitted testimony was therefore relevant and not unfairly prejudicial, confusing, or misleading.

[20] The trial court did not abuse its discretion in admitting Gillaspy's testimony.

## Sufficient evidence supports the jury's verdict and the damages awarded were not excessive.

[21] After the jury returned its verdict of $2.5 million, Defendants moved for judgment on the evidence in their motion to correct error, arguing the jury verdict was unsupported by the evidence and excessive. The trial court denied Defendants' motion, and Defendants now appeal.

[22] As our Supreme Court has recently stated:

> The Indiana Constitution expressly protects the jury-trial right in civil cases. Ind. Const. art. 1, § 20. During trial, juries "are the exclusive judges of the evidence," *Rannells v. State*, 18 Ind. 255, 257 (1862), and parties have a "constitutional right . . . to have a jury determine the credibility of the witnesses and the weight that shall be given the evidence and to decide the facts accordingly," *Cosme v. Clark*, 232 N.E.3d 1141, 1149 (Ind. 2024) (quoting *Novak v. Chicago & Calumet Dist. Transit Co.*, 135 N.E.2d 1, 5 (Ind. 1956)). Given this essential role, a trial court can only withdraw an issue from a jury's consideration or overturn a jury's verdict in limited circumstances.

*Indianapolis Pub. Transp. Corp. v. Bush*, No. 25S-CT-245, 2025 WL 2640911, at *3 (Ind. Sept. 15, 2025). Under our trial rules, a trial court shall reverse a jury's verdict and enter judgment on the evidence if the verdict "is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it." Ind. Trial Rule 50(A). When considering such a motion, a trial court "has no factfinding role and simply assesses whether 'the evidence supports any reasonable inference in favor of the nonmovant.'" *Bush*, 2025 WL 2640911, at *4 (quoting *Cosme*, 232 N.E.3d at 1152). A party may move for judgment on the evidence at various stages of the proceedings, including in a post-verdict Trial Rule 59 motion to correct error. *See* T.R. 50(A)(4).

[23] When a party raises a Rule 50(A) argument in a Rule 59(J) motion to correct error, "the trial court reviews the evidence as if it were considering a Rule 50(A)

motion raised before judgment at trial." *Bush*, 2025 WL 2640911, at *5.[6] In both instances, *de novo* review on appeal is appropriate because the paper record alone is enough for a reviewing court to assess whether the evidence supports any reasonable inference in favor of the nonmovant. *Id*. Accordingly, we review *de novo* the trial court's denial of Defendants' motion to correct error. *See id*. We must determine whether the evidence—viewed most favorably to Gillaspy—supports the jury's verdict. *See id*. In so doing, we will not weigh conflicting evidence or assess witness credibility. *See id*.

[24] Although Defendants contend there was insufficient evidence to support the verdict, Defendants do not argue Gillaspy failed to meet her burden of proof on any essential elements of the malicious prosecution and abuse of process claims.

---

[6] In a Trial Rule 59(J) motion to correct error, a party may argue the verdict is either "against the weight of the evidence" or "clearly erroneous as contrary to or not supported by the evidence." T.R. 59(J)(7). In the first case, "the trial court acts as a 'thirteenth juror' and not only reviews the evidence but also weighs it and assesses witness credibility." *Bush*, 2025 WL 2640911, at *4. In the latter case, the trial court does not weigh evidence or assess witness credibility. *Id*. In their motion to correct error, Defendants argued no evidence at trial supported the element of damages. *See Appellant's App. Vol. 2* at 61 (Defendants arguing in their motion to correct error that the jury's verdict could not stand "[i]n light of this complete lack of evidence supporting an award of damages for emotional distress"); *Tr. Vol. 5* at 35 (Defendants arguing at hearing on the motion to correct error there is a "complete absence of evidence to support two point five million dollars"). On appeal, Defendants now claim "[b]ecause there is *no probative evidence* supporting the essential element of damages to Gillaspy's malicious prosecution and abuse of process claims, the jury's verdict is *against the weight of the evidence*." *Appellants' Br*. at 17 (emphasis added).

A claim the "proof is missing altogether on an element of a claim" is better understood as a claim the verdict is "clearly erroneous or not supported by the evidence" rather than "against the weight of the evidence." *See Weida v. Kegarise*, 849 N.E.2d 1147, 1152 (Ind. 2006). To the extent Defendants now argue their Trial Rule 59(J) motion was a claim the verdict was against the weight of the evidence, we elect to modify the argument to challenge the basis of the trial court's finding the verdict was clearly erroneous. *See Neher v. Hobbs*, 760 N.E.2d 602, 607 (Ind. 2002) (the appellate court "elect[ing] to modify the defendant's argument to challenge the basis of the trial court's finding that the verdicts were clearly erroneous" where the trial court's order on a Trial Rule 59(J) motion was not based on its weighing of the evidence but upon its finding that the verdicts were clearly erroneous as contrary to the evidence).

Rather, Defendants attack the jury's damage award of $2.5 million, arguing it was excessive. When a party alleges a jury verdict is excessive or inadequate, a motion to correct error is a prerequisite to appeal. *See* T.R. 59(A)(2). Our Supreme Court has set out the standard for reviewing a claim that a damage award is excessive:

> We afford a jury's damage awards great deference on appeal. A damage award will not be reversed if it falls within the bounds of the evidence. We look only to the evidence and inferences therefrom which support the jury's verdict, and will affirm it if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting.

*Sims v. Pappas*, 73 N.E.3d 700, 709 (Ind. 2017) (internal quotations and citations omitted). "Appellate courts will not substitute their idea of a proper damage award for that of the jury." *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001) (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *trans. denied*). "Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence." *Id*. (quoting *Annee v. State*, 271 N.E.2d 711, 713 (Ind. 1971)). "However, we will find the judgment to be excessive if the amount cannot be based on anything other than prejudice, passion, partiality, corruption, or some other element of improper consideration." *Sims*, 73 N.E.3d at 709.

[25] Many years ago, the Appellate Court of Indiana explained that in a malicious prosecution action, "the plaintiff may recover all damages which are the natural

probable consequences of the malicious prosecution complained of," which includes "as compensatory damages the pecuniary loss which results directly from such prosecution." *Dwyer v. McClean*, 175 N.E.2d 50, 52 (Ind. App. 1961), *trans. denied*.[7] An "action for malicious prosecution, like actions for libel or slander, involves the question of compensation for an injury to character." *Id*. (internal quotation omitted). As a result, the plaintiff's "humiliation, embarrassment, and mental anguish" are proper considerations for a jury determining an award of compensatory damages in an action for malicious prosecution. *See Lazarus Dep't Store v. Sutherlin*, 544 N.E.2d 513, 526 (Ind. Ct. App. 1989), *trans. denied*. And "a jury is afforded even greater latitude in determining these kinds of damages than that discretion traditionally granted juries in assessing damage awards." *Id.; see also Groves v. First Nat'l Bank of Valparaiso*, 518 N.E.2d 819, 831 (Ind. Ct. App. 1988) ("Our courts have traditionally granted the jury a great deal of discretion in assessing damage awards, especially when the jury is assessing damages of a kind for which the law provides no precise standards of measurement.") (internal citation omitted), *trans. denied*. "Physical and mental pain are, by their very nature, not readily susceptible to quantification, and, therefore, the jury is given very wide latitude in determining these kinds of damages." *Groves*, 518 N.E.2d at 831.

---

[7] The plaintiff in a malicious prosecution action may "also recover as exemplary and punitive damages for the non-pecuniary losses if any have been sustained." *Dwyer*, 175 N.E.2d at 52. In this case, Gillaspy did not request, and the jury did not award, punitive damages.

At the close of trial, the trial court instructed the jury that in deciding the amount of money to award as damages, if any, it may consider:

> (1) the nature and extent of the harms and losses, and the effect of the harms and losses on Plaintiff's ability to function as a whole person;
>
> (2) whether the harms or losses are temporary or permanent;
>
> (3) the value of lost time;
>
> (4) the physical pain and mental suffering experienced and to be experienced in the future as a result of the harms and losses;
>
> (5) the reasonable value of necessary medical care, treatment, and services plaintiff incurred and will incur in the future as a result of the harms and losses; and
>
> (6) the aggravation of a pre-existing condition[.]
>
> There is no fixed standard or measure in the case of intangible items such as humiliation, physical pain, embarrassment, mental anguish, and emotional distress. You must determine a fair and adequate award of these items through the exercise of your judgment and experience in the affairs of the world after considering all the facts and circumstances presented during the trial of this case.

*Appellee's App. Vol. 2* at 15. The trial court also gave an "eggshell skull" instruction, stating, in part, that a "defendant is thus liable to the extent that

their conduct aggravates a pre-existing condition, but is not liable for damages stemming from a pre-existing injury that independently causes harm." *Id*. at 16.

[27] The evidence most favorable to Gillaspy is that after the February 13 incident and after Newtone terminated her employment, she felt "horrible" because she "didn't have [a job] anymore" or "any way of bringing at least a little money back into the house." *Tr. Vol. 4* at 86. She stopped exercising and gained weight. When she started working at VASA in December 2019, her "confidence was coming back" and she felt "that good feeling of at least having that part of my life back." *Id.* at 86, 87. But then Defendants filed their counterclaims against Gillaspy in April 2020. When asked at trial how that made her feel, Gillaspy responded:

> Well, at first I was in shock. I had no idea how I could be being sued . . . for things that weren't even true, for things I didn't do, for, I mean, it just brought everything, all the same feelings from February 13th of---I didn't know what I could do, what, I was going to [sic] not only lost my job, I am getting called a liar and now I'm being sued for two point one million dollars.

*Id.* at 90. She elaborated: "It felt horrible [and] like I was powerless." *Id.* at 91. It made her feel "[s]mall" and she again lost her confidence. *Id.* at 99. Gillaspy testified she "pulled away a lot more" from her husband because she just "didn't know what to do." *Id.* at 91. She would think about the fact she was being sued "all the time" while at work and at home. *Id*. After she was sued, she again stopped exercising. Although that was around the same time as the COVID-19 pandemic caused VASA to close temporarily, she testified since

then, "I completely pretty much stopped . . . [w]orking out at the gym [and] teaching . . . . Up until now I don't work out like I should. Or used to." *Id.* at 92. She also testified Defendant's countersuit negatively impacted her job at VASA, because she felt "the same feelings from 2018, of distancing myself from all the things I loved doing there." *Id.* at 94.

[28] Gillaspy's husband, Carlton Oswald, also testified at trial. According to Oswald, Gillaspy "loved being a personal trainer" because she "loved helping people" and "was definitely a lot happier" when she was working as one. *Tr. Vol. 3* at 178. After Vaughn's sexual misconduct, "she was physically and emotionally distraught" and the events "took a toll" on their children. *Id*. at 179–80. After several months, she began to improve and "she started working out again and we were doing things as a family." *Id*. As he described, "she really didn't seem to get happier until she started personal training again" at the end of 2019. *Id*. at 182. But after Defendants filed their countersuit, Oswald testified Gillaspy "pulled away from the family" and they "quit doing stuff" together, such as going out to eat. *Id*. at 177. And a "big one for her, she quit working out." *Id*.

[29] Sarah Scales, Gillaspy's friend, testified Gillaspy appeared "withdrawn and depressed and she was back into a bad state of mind" when Defendants sued her. *Id.* at 187. She noticed Gillaspy was "quiet," did not "want to go do anything," did not talk or "return texts or calls." *Id*. According to Scales, Gillaspy was feeling "mostly disbelief and sad and just upset that everything

was happening." *Id.* At the time of trial, Scales described Gillaspy as "not the same happy person that she was before." *Id.* at 193.

[30] Considering the evidence most favorable to Gillaspy, the jury could reasonably infer Gillaspy suffered humiliation, embarrassment, mental anguish, discomfort, and inconvenience at being sued for defamation after she sought redress for Vaughn's sexual misconduct. *See, e.g., Snider v. Lewis*, 276 N.E.2d 160, 175–76 (Ind. App. 1971) (holding a jury could reasonably infer a trial court judge suffered "humiliation, embarrassment, mental anguish, harassment, and doubts as to his honesty and integrity . . . in his community" as the result of a federal lawsuit filed against him and others and the fact the contents of the suit became common knowledge). And given Gillaspy's personal history with being accused of lying about accusations of sexual abuse, the jury could reasonably infer Defendants' actions of suing Gillaspy for defamation after she alleged Vaughn engaged in sexual misconduct aggravated a preexisting injury.

[31] Defendants' arguments acknowledge there was evidence—albeit a "paucity" of it, in their view—tending to show Gillaspy suffered mental anguish when Defendants maliciously subjected her to legal process. *Appellants' Br.* at 15; *see also Appellant's Reply Br.* at 11 ("Vaughn concedes that there was testimony concerning mental distress experienced by Gillaspy following the filing of the Federal Counterclaim[.]"). Still, Defendants argue the jury verdict cannot stand because Gillaspy failed to present evidence she suffered some physical or psychological manifestation of emotional distress. *See Appellant's Br.* at 15 (citing *Lazarus*, 544 N.E.2d 513, 526).

Defendants liken this case to *Groves v. First National Bank of Valparaiso*, in which this Court set aside a jury verdict of compensatory damages for mental anguish as excessive. 518 N.E.2d 819. There, the plaintiffs sued a bank for breach of contract and fraud after the bank sold them real property with clouded title. At trial, the plaintiffs testified they incurred legal expenses and were frightened and angry when they learned they no longer had good title, and the jury returned a general verdict of $100,000 for the plaintiffs, most of which was for mental anguish. *See id*. at 831 n.6 ("The bulk of the verdict, then, must have been for mental anguish."). On appeal, this Court reviewed the damages for emotional distress "with some reluctance," observing the appellate court was "not, after all, present to review the demeanor of the witnesses as they recounted the events which occurred here and the emotional trauma which the events induced[.]" *Id*. at 831. Still, the *Groves* Court concluded "that, in the absence of evidence of any physical or psychological manifestation of mental anguish, the award of nearly $100,000" was too high. *Id*. at 832. The Court remanded for a new trial to determine the proper amount of compensatory damages for mental anguish and if the plaintiffs were entitled to exemplary damages for fraud.

We do not reach the same conclusion as the *Groves* Court. Like the Court there, we are reluctant to invade the province of the jury, particularly where it was called to assess damages "of a kind for which the law provides no precise standards of measurement." *Id.* at 831. But unlike in *Groves*, the evidence here extends beyond temporary feelings of fright and anger. The testimony established Gillaspy lost interest in activities she formerly enjoyed, such as

working out with others. Her relationships with family and friends suffered, as did her ability to engage in her work. And she experienced physical changes, such as weight gain. Scales testified to the lasting impact on Gillaspy, describing Gillaspy at trial as "not the same happy person that she was before." *Tr. Vol. 3* at 193. *Groves* does not compel us to set aside the jury verdict.

[34] Defendants also argue Gillaspy failed to prove her injuries were caused by the filing of the federal counterclaims. According to Defendants, causation "is a complicated medical question" requiring expert medical testimony to establish. *Appellant's Br.* at 17 (citing *Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005), *trans. denied*). In the context of negligence claims, ordinarily "the question of the causal connection between a permanent condition, an injury and a pre-existing affliction or condition is a complicated medical question." *Daub v. Daub*, 629 N.E.2d 873, 877–78 (Ind. Ct. App. 1994), *trans. denied*. "When the issue of cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary." *Id*. at 878. Therefore, expert medical testimony is ordinarily required to establish causation in fact, or "but for" causation, to satisfy the requirement of a reasonable connection between a defendant's conduct and the damages a plaintiff has suffered. *See id*. (in negligence action, expert testimony necessary to establish slip-and-fall caused plaintiff's back injury); *Topp*, 838 N.E.2d at 1033 (in negligence case, expert testimony necessary to establish car accident caused plaintiff's neck and back pain). But Defendants point us to no authority that expert testimony was necessary to aid the jury in determining that Gillapsy's mental anguish was the

"natural probable consequence[]" of Defendants' malicious prosecution. *Dwyer*, 175 N.E.2d at 52. And even in the context of a negligence claim, no expert testimony is required "on medical matters which are within the common experience, observation, or knowledge of laymen[.]" *Renner v. Shepard-Bazant*, 172 N.E.3d 1208, 1214 (Ind. 2021) (citation omitted). No expert testimony was necessary here, especially given our precedent approving of compensatory damages for mental anguish in actions for malicious prosecution. *See Lazarus*, 544 N.E.2d at 526.

[35]     Defendants also argue the jury's verdict cannot be explained by anything other than prejudice, passion, partiality, or some other element of improper consideration, and therefore must be excessive. Indeed, a jury's discretion in making a damage award is not limitless, and judicial intrusion may be warranted when the amount of damages "appear[s] to be so outrageous as to impress the court at 'first blush' with its enormity." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 221 (Ind. 2010) (quoting *Kimberlin v. DeLong*, 637 N.E.2d 121, 129 (Ind. 1994)).

[36]     Defendants first contend the award failed the "first blush" test when the trial court read the verdict aloud in court. The court stated: "we the jury decide in favor of the plaintiff . . . and decide that plaintiff's damages are, if I have this correct, two million five hundred thousand dollars. Is that accurate? Okay. Counsel, go ahead and be seated. Does anybody wish to poll the jurors in this case?" *Tr. Vol. 5* at 10. Both parties declined. Although Defendants contend it is "apparent" the Court's comments "were not related to poor penmanship on

the part of the foreperson," we cannot be so sure. *Appellant's Br*. at 19. This is perhaps a good example of how, as an appellate court, we are in a poor position to assess demeanor on a cold record. Transcribed, the trial court's comments convey no shock or surprise at an outrageous verdict.

[37] Beyond first blush, Defendants argue the jury's verdict can only be explained as an attempt "to punish the Defendants for a sexual assault, sex abuse, wrongful termination and for being a womanizer." *Id.* at 21–22. Defendants allege Gillaspy's "entire trial plan was designed to inflame the passion of the jury and garner prejudice against Vaughn." *Id.* at 22. They point to opposing counsel's focus on sexual assault in *voir dire*; trial testimony about Vaughn's treatment of other female employees; Gillaspy's testimony about childhood sexual abuse; and statements Gillaspy's counsel made in closing arguments.

[38] As to plaintiff's counsel's statements in jury selection and closing arguments, Defendants largely did not object to the statements they now complain about on appeal. They have failed to preserve these alleged errors for our consideration. *See Wisner v. Laney*, 984 N.E.2d 1201, 1208–09 (Ind. 2012) (failure to object to allegedly improper statements made by counsel in *voir dire* and closing arguments waives challenges to the statements on appeal).[8]

---

[8] Defendants once objected during *voir dire* to Gillaspy's line of questioning about whether a victim of sexual assault can suffer trauma absent penetration and whether such harm can be valued at millions of dollars. Defendants' objection was based on their belief Gillaspy's counsel was using a juror who was a therapist with experience treating sexual assault victims to educate other prospective jurors about the effects of sexual violence on victims. The trial court held a sidebar conference, during which Defendants' counsel then appeared to agree the questions were permissible to some extent. *Tr. Vol. 2* at 148 (defense counsel stating, "maybe I don't have a valid objection, but the first question was, can we talk about damages when there's no

Similarly, regarding the testimony of former Newtone employees that Vaughn persistently made comments about their appearances, Defendants either did not object or withdrew their objections. *See Tr. Vol. 3* at 151 (trial court acknowledging Defendants withdrew their objection to first employee's testimony); *Id*. at 166 (no objection to second employee's testimony Vaughn made "sex advances towards" her); *Id*. at 197 (no objection to Scales' testimony characterizing defense counsel as "representing somebody for sexual assault").

[39] Still, we acknowledge Defendants' argument on appeal is not so much about individual evidentiary rulings but the cumulative effect of Gillaspy's trial strategy, which Defendants contend focused too significantly on Vaughn's sexual misconduct. *See Appellant's Reply Br.* at 12 ("Collectively [counsel's comments and the allegedly improperly admitted evidence] support a tangible indication that the jury acted out of prejudice, passion, or partiality to punish Vaughn for something other than filing a compulsory counterclaim.").

[40] To that end, the trial court went to great pains to avoid conducting a "trial within a trial" about Vaughn's sexual misconduct and to prevent confusing the

penetration? Alright, okay"). In any case, Defendants do not claim on appeal these questions were asked over their objection. Having reviewed the entire record, we conclude the objection, if any, was waived.

Defendants also objected once during closing arguments to Gillaspy's counsel's commentary on the fact a former Newtone employee's boyfriend accompanied her to court when she testified. Gillaspy's counsel stated in closing, "in testifying yesterday, this woman, brought her big strong boyfriend with her. Because even though she no longer works for [Vaughn], she's under his thumb. She still wanted to bring some protection." *Tr. Vol. 2* at 218. Defendants objected, but the trial court ruled, "The parties are allowed to characterize the evidence as they see fit." *Id*. On appeal, Defendants make no independent argument that the trial court abused its discretion in so ruling.

issues or misleading the jury into awarding damages based on sexual misconduct, rather than Gillaspy's claims that Defendants abused the judicial process. Yet the parties agreed the resolution of Gillaspy's malicious prosecution claim depended on whether Defendants had probable cause to countersue Gillaspy for defamation in the federal lawsuit, which in turn depended on whether Vaughn engaged in sexual misconduct or Gillaspy was lying about it. Given the nature of the claims in both lawsuits, discussion of Vaughn's acts of sexual misconduct was unavoidable. And we tend to agree with Gillaspy that this was largely a problem of Defendants' own making, having chosen to put Vaughn's and Gillaspy's credibility about the events of February 13 at issue when Vaughn countersued for defamation. After all, truth is a complete defense to a civil defamation claim. *Melton*, 925 N.E.2d at 437.

[41] From the start, the trial court acknowledged the difficulty in parsing the issues. The record shows the court and parties extensively discussed the jury instructions to aid the jury's decision and ensure the jury, if deciding for Gillaspy, appropriately assessed damages. The trial court instructed the jury on the elements of malicious prosecution, abuse of process, defamation, probable cause, malice, and damages, including the "eggshell skull" doctrine. The instructions explained the proper standard of proof. The trial court also instructed: "Do not base your verdicts on sympathy, bias, or prejudice." *Appellee's App. Vol. 2* at 11. On appeal, Defendants claim no error in the instructions the trial court gave the jury. And we must presume the jury followed them. *Pruitt v. State*, 622 N.E.2d 469, 473 (Ind. 1993). Defendants

have failed to show the jury's verdict and damage award were based on improper consideration. Accordingly, we cannot conclude the jury's award was excessive.

## Conclusion

The trial court did not abuse its discretion in admitting certain testimony. Sufficient evidence supports the jury's verdict, and the award is not excessive.

Affirmed.

Bradford, J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANTS

Ryan C. Munden
S. Kyle Dietrich
Reiling Teder & Schrier, LLC
Lafayette, Indiana


ATTORNEY FOR APPELLEE

Duran L. Keller
Keller Law
Lafayette, Indiana